UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| IN RE: | CASE NO. 23-17590-EPK |
|---|---|
| MV REALTY PBC, LLC, *et al.*, | CHAPTER 11 |
| Debtors. | (Jointly Administered) |
| MV REALTY PBC, LLC, a Florida limited liability company, MV REALTY HOLDINGS, LLC, a Florida limited liability company, MV REALTY PBC, LLC, a Pennsylvania limited liability company, MV REALTY NEW JERSEY, a New Jersey limited liability company, MV REALTY OHIO, LLC, a Ohio limited liability company, MV REALTY NORTH CAROLINA, LLC, a North Carolina limited liability company, MV OF MASSACHUSETTS, LLC, a Massachusetts limited liability company, MV REALTY INDIANA, LLC, an Indiana limited liability company, and MV REALTY ILLINOIS, LLC, an Illinois limited liability company, Plaintiffs, vs. OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA DEPARTMENT OF LEGAL AFFAIRS, COMMONWEALTH OF MASSACHUSETTS, COMMONWEALTH OF PENNSYLVANIA (By Attorney General Joshua Shapiro), MATTHEW V. PLATKIN, | ADV. NO. |

| | |
|---|---|
| ATTORNEY GENERAL OF STATE OF NEW JERSEY, CARI FAIS, ACTING DIRECTOR OF THE NEW JERSEY DIVISION OF CONSUMER AFFAIRS, STATE OF NORTH CAROLINA, *ex rel.* JOSHUA H. STEIN, ATTORNEY GENERAL, STATE OF OHIO, DEPARTMENT OF COMMERCE, DIVISION OF REAL ESTATE AND PROFESSIONAL LICENSING, and OFFICE OF THE ATTORNEY GENERAL, STATE OF INDIANA,<br><br>      Defendants. | |

## ADVERSARY COMPLAINT TO EXTEND
## THE AUTOMATIC STAY AND FOR INJUNCTIVE RELIEF

MV Realty PBC, LLC, a Florida limited liability company ("PBC FL"), MV Realty Holdings, LLC, a Florida limited liability company ("Holdings"), MV Realty PBC, LLC, a Pennsylvania limited liability company ("PBC PA"), MV Realty New Jersey, LLC, a New Jersey limited liability company ("MV NJ"), MV Realty Ohio, LLC, an Ohio limited liability company ("MV OH"), MV Realty Noth Carolina, LLC, a North Carolina limited liability company ("MV NC"), MV of Massachusetts, LLC, a Massachusetts limited liability company ("MV MA"), MV Realty Indiana, LLC, an Indiana limited liability company ("MV IN"), and MV Realty Illinois, LLC, an Illinois limited liability company ("MV IL" and collectively with PBC PA, Holdings, MV NJ, MV OH, MV NC, MV MA, and MV IN, the "Plaintiffs"), file this adversary complaint (the "Complaint") against Office of the Attorney General, State of Florida Department of Legal Affairs ("FL"), Commonwealth of Massachusetts ("MA"), Commonwealth of Pennsylvania (By Attorney General Joshua Shapiro) ("PA"), Matthew V. Platkin, Attorney General of State of New Jersey ("Platkin"), Cari Fais, Acting Director of the New Jersey Division of Consumer Affairs ("Fais"), State of North Carolina, Joshua H. Stein, Attorney General ("NC"), and Ohio Department

2

of Commerce, a Division of Real Estate and Professional Licensing ("OH"), and Office of the Attorney General, State of Indiana ("IN" and collectively with Florida, Mass, PA, Platkin, Fais, NC and OH, the "Defendants"), and state as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

3. The statutory predicates for the relief requested in this Complaint are Bankruptcy Code §§ 105(a), 362(a) and Rule 7065 of the Federal Rules of Bankruptcy Procedure.

## THE PARTIES

4. On September 13, 2023, each of the Plaintiffs filed a voluntary petition under Chapter 11 of Title 11 of the United States Code. The above-captioned Chapter 11 cases (collectively, the "Cases") are being jointly administered under lead case, *In re: MV Realty PBC, LLC*, Case No. 23-17590-EPK (the "Case"). Each of the Plaintiffs continues in possession of its assets as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. The Plaintiffs are the debtors and debtors-in-possession in the Cases.

5. The State of Florida, Department of Legal Affairs is, upon information and belief, a department within the Office of the Attorney General for the State of Florida, overseen by the Attorney General, The Honorable Ashley Moody, and is the State plaintiff in Case No. 22-CA009958 (the "Florida Action"), an action pending against PBC FL, Amanda Zachman ("Ms. Zachman"), Antony Mitchell ("Mr. Mitchell"), and David Manchester ("Mr. Manchester").

6. The Commonwealth of Massachusetts is a state in the United States of America, and is the State plaintiff, by and through its Attorney General, The Honorable Maura Healey, in

3

Case No. 2284CV02823-BLS (the "Massachusetts Action"), an action pending against PBC FL and MV MA.

7. The Commonwealth of Pennsylvania is a state in the United States of America, and by and through its Attorney General, The Honorable Joshua Shapiro, is the State plaintiff in Case No. 221201288 (the "Pennsylvania Action"), an action pending against PBC PA and Ms. Zachman.

8. The Honorable Matthew V. Platkin, is the acting Attorney General of the State of New Jersey and is a State plaintiff in Case No. EX-C-000080-23 (the "New Jersey Action"), an action pending against PBC PA, MV NJ, Ms. Zachman, Mr. Manchester, Mr. Mitchell, and David Reiner ("Mr. Reiner").

9. Cari Fais is the acting director of the New Jersey Division of Consumer Affairs and is a State plaintiff in the New Jersey Action.

10. The State of North Carolina is a state within the United States of America, and by and through its Attorney General, The Honorable Joshua H. Stein, is the State plaintiff in Case No. 23CV006408-910 (the "North Carolina Action"), an action pending against PBC FL, MV NC, Ms. Zachman, Mr. Mitchell, Mr. Manchester, and Darryl Cook ("Mr. Cook").

11. The State of Ohio, Ohio Department of Commerce, Division of Real Estate and Professional Licensing, is the State plaintiff in Case No. 23-CV-963 (the "Ohio Action"), an action pending against MV OH, Ms. Zachman and Diana Remar ("Ms. Remar").

12. The State of Indiana is a state within the United States of America, and by and through its Attorney General, The Honorable Todd Rokita, is the State plaintiff in Case No. CV-01578-MPB-MG (the "Indiana Action" and, collectively with the Florida Action, Massachusetts Action, Pennsylvania Action, New Jersey Action, North Carolina Action, and Ohio Action, the "Primary State Actions").

13. Although not named Plaintiffs, the following individuals are named defendants in one or more of the Primary State Actions (collectively, the "Individual Defendants"): (a) Mr. Mitchell is the chief executive officer or manager of the Debtors, (b) Ms. Zachman is a member of the board of managers of one or more of the Debtors, (c) Mr. Manchester is a member of the board of managers of one or more of the Debtors, (d) Mr. Reiner is a real estate broker in New Jersey, (e) Mr. Cook is a real estate broker in North Carolina, and (f) Ms. Remar is a real estate broker in Ohio.

**GENERAL ALLEGATIONS**

*A.     Organizational Structure*

14. Holdings is a Florida limited liability company and the sole owner of PBC, a Florida limited liability company.

15. PBC FL is the sole owner of the following: (a) Receivables II, a Delaware limited liability company; (b) MV Realty California, a California corporation; and (c) thirty-one (31) separate subsidiaries, each of which is a limited liability company organized under the laws of the states of Pennsylvania, South Carolina, North Carolina, Massachusetts, Illinois, Arizona, Connecticut, Georgia, New Jersey, Washington, Maryland, Virginia, Tennessee, Wisconsin, Nevada, Oregon, Utah, Minnesota, Indiana, Missouri, New York, Idaho, Alabama, Colorado, Oklahoma, Louisiana, Kansas, Michigan, Kentucky, Texas and Ohio (collectively with California, the MV Realty Subs. Each of the MV Realty Subs is incorporated or organized under the laws of the respective states: "MV Realty of California" and "MV Realty of [state], LLC" (with the exception of New York ("MV Homes of New York") and Massachusetts ("MV of Massachusetts").

5

**B.      *Business Operations*** 

16.     PBC FL is the servicing entity, which operates primarily from premises located at 815 Broken Sound Parkway, Boca Raton, Florida 33487.

17.     PBC FL was founded in 2014 and initially operated as a traditional real estate brokerage firm. In October 2018, PBC FL began focusing its efforts on developing and marketing a unique product to residential homeowners.

18.     In or around October 2018, PBC FL implemented the "Homeowner Benefit Program" (the "HBP"). As part of the HBC, the MV Realty Subs enter "Homeowner Benefit Agreements" (the "HBA") with residential homeowners. The HBA is not a listing agreement but is a forward listing contract pursuant to which the MV Realty Subs pay an upfront cash payment to homeowners in exchange for the exclusive right to list a homeowner's home if and when the homeowner decides to sell their home. The term of the HBA is forty (40) years subject to certain early termination events.

19.     In accordance with an HBA, a selling homeowner lists their home with the applicable MV Realty Sub, which then lists and sells the home for a standard commission, including any participating broker commission. In the event the home does not sell within six (6) months, the homeowner has the opportunity to sell the property on their own, failing which the HBA agreement remains with the MV Realty Sub. The HBA is not a listing agreement.

20.     In the event a homeowner breaches the HBA, which results in an early termination of the HBA, the MV Realty Subs are typically entitled to a termination fee equal to three percent (3%) of the greater of (a) the fair market value of the home at the time the HBA is executed, and (b) the fair market value at the time of breach or early termination. There are other termination events under the HBAs.

21. Additionally, the MV Realty Subs reserve the right to record a memorandum ("Memorandum"), or other similar notice, of the HBA in the public records in the county in which the real estate is located. Although the HBAs are governed by the laws of the state in which the HBA is entered, the terms of the HBAs and Memoranda are substantively consistent from state to state.

22. At the present time, the MV Realty Subs are parties to approximately 34,000 HBAs with residential homeowners (the "HBA Parties"). The HBAs may be considered executory contracts within the meaning of 11 U.S.C. § 365.

**D.**   *Financing – Goodwood I*

23. On or about February 11, 2020, MV Receivables I, LLC ("Receivables I"), a wholly owned subsidiary of PBC FL, entered into a credit agreement (the "Goodwood I Credit Agreement") with Goodwood Fund, as the initial lender ("Goodwood Fund" and, together with other lenders under the Goodwood I Credit Agreement, the "Goodwood I Lenders"), and Goodwood Inc., as agent ("Goodwood Inc."). The parties also executed, among other documents, a Security Agreement (the "Goodwood I Security Agreement" and, collectively with the Goodwood I Credit Agreement and other related documents, the "Goodwood I Loan Documents").

24. PBC FL and Receivables I also entered a Purchase and Contribution Agreement (the "Purchase Agreement") pursuant to which Receivables I agreed to purchase HBAs acquired with amounts advanced under the terms of the Goodwood I Credit Agreement. The advance rate is typically sixty percent (60%) of discounted eligible receivables. The amount of $10,000,000.00 has been advanced under the Goodwood I Credit Agreement.

25. Under the Goodwood I Security Agreement, Receivables I granted a security interest in and to its assets, including, without limitation, certain HBAs, accounts, receivables, and general intangibles, in favor of Goodwood Inc., as agent for the Goodwood I Lenders. PBC signed a limited guarantee of amounts owed by Receivables I under the Goodwood I Credit Agreement.

**E.**     **_Financing – Monroe Capital_**

26. On or about July 28, 2021, Receivables II entered into a $40,000,000.00 senior secured delayed draw credit facility (the "Monroe Credit Facility") with Monroe Capital Management Advisors, LLC, as administrative and collateral agent ("Monroe Capital"), and the lenders under the Monroe Credit Facility (collectively, the "Monroe Lenders"). Receivables II and Monroe Capital executed, among other documents, a Credit Agreement (the "Monroe Credit Agreement"), Security Agreement (the "Monroe Security Agreement", and Pledge Agreement (the "Monroe Pledge Agreement" and, collectively with Monroe Credit Agreement, the Monroe Security Agreement, and related other agreements, the "Monroe Loan Documents").

27. The Monroe Lenders have advanced the amount of $40,000,000.00 to Receivables II under the Monroe Credit Facility, the proceeds of which were to be used to acquire eligible receivables in accordance with the Monroe Credit Agreement and to fund operations and other related expenses.

28. Under the Monroe Credit Facility, PBC FL, certain of the MV Realty Subs (New Jersey, Connecticut, Illinois, Massachusetts, North Carolina, South Carolina, and Georgia) (collectively, and excluding PBC, the "Initial MV Realty Guarantors") initially guaranteed the obligations of Receivables II. The Monroe Credit Facility was later guaranteed by subsequent

MV Realty Subs, who organized and became parties to the Monroe Credit Facility and Monroe Loan Documents as the operation expanded.

29. In accordance with the Monroe Pledge Agreement, (a) Holdings pledged its equity interest in PBC FL, and (b) PBC FL pledged its membership interests in the MV Realty Subs, in favor of Monroe Capital, as collateral agent. All membership interests are uncertificated.

30. In accordance with the Monroe Security Agreement, Receivables II, PBC FL, and the Initial MV Realty Guarantors, as well as any other MV Realty Subs who later joined the Monroe Credit Facility and Monroe Loan Documents, granted Monroe Capital a security interest in their assets, including, without limitation, accounts, documents, general intangibles, investment property, receivables, and receivables relating to the HBAs.

31. Generally speaking, (a) the MV Realty Subs would entered into HBAs with homeowners, thus giving the MV Realty Subs the exclusive right to list homes in the event a homeowner ever decide to sell their home, (b) the receivables under the HBAs were to be sold or otherwise assigned to MV Receivables II, and (c) Monroe Capital then advanced at a rate of forty-five percent (45%) of the net present value of eligible receivables under the HBAs.

### F.    *Consent and Confirmation Agreement*

32. In or about July 2021, Monroe, Goodwood Inc., PBC FL and Receivables I entered into the Acknowledgement and Confirmation Agreement (the "Confirmation Agreement"), which was, essentially, an inter-creditor agreement, pursuant to which Monroe and Goodwood Inc. acknowledged and consented to the other's respective rights under the Monroe Capital Loan Documents and the Goodwood I Loan Documents, respectively.

### G.	Financing - Goodwood II

33.	On November 4, 2022, MV Receivables III, LLC ("Receivables III"), Goodwood MV Realty LP, as the initial lender ("Goodwood MV" and, together with any other related lenders, the "Goodwood II Lenders"), and Goodwood, Inc. ("Goodwood Inc."), as agent, entered into a Credit Agreement (the "Goodwood II Credit Agreement"). The parties also executed, among other documents, a Security Agreement (the "Goodwood II Security Agreement" and, collectively with the Goodwood II Credit Agreement and other related documents, the "Goodwood II Loan Documents").

34.	In accordance with the Goodwood II Credit Agreement, Receivables IIII agreed to purchase HBAs acquired with amounts advanced under the terms of the Goodwood II Credit Agreement. The advance rate was approximately sixty percent (60%) of the net present value of eligible receivables under the HBAs. The amount of $4,500,000.00 has been advanced.

35.	Under the Goodwood II Security Agreement, Receivables III granted Goodwood Inc. a security interest in and to its assets, including, without limitation, the HBAs, accounts, receivables, and general intangibles. MV Brokerage signed a limited guarantee of amounts owed by Receivables III under the Goodwood II Credit Agreement.

### H.	Other Financing

36.	In February 2023, Holdings executed senior notes with eight (8) shareholders of Holdings, who advanced a total of $12,968,000.00 (collectively, the "Shareholder Notes"). There is approximately $14,103,144.11 outstanding, including accrued interest, under the Shareholder Notes. The proceeds borrowed were used to fund operations.

37. Additionally, in 2021 and 2022, Holdings executed two (2) rounds of convertible notes, one of which has since converted. The later round, which was in the total amount of $6,070,000.00, has not been converted.

## I.      *Assets and Secured Obligations*

38. Monroe is currently owed approximately $55,000,000.00, while the Goodwood I Lenders and Goodwood II Lenders are owed approximately $7,408,275.82 and $4,460,000.00, respectively. As of September 5, 2023, the net present value of the collateral securing the foregoing obligations is (a) $89,315,255.01 (Monroe), (b) $12,656,966.30 (Goodwood I), and (c) $6,106,069.54 (Goodwood II). Holdings has additional HBAs with an aggregate net present value of approximately $12,861,536.97. Accordingly, the total net present value of HBAs exceeds $120,000,000.00 and there is potential equity for the benefit of unsecured creditors and equity holders.

## EVENTS LEADING TO BANKRUPTCY

39. Beginning in November 2022, the Defendants commenced the Primary State Actions. In the Primary State Actions, the Defendants allege wrongdoing ranging from telemarketing violations to unfair and deceptive trade practices.

40. The Defendants also allege that the filing of the memorandum or similar notice, which provides constructive notice to the public of the existence of the HBA and its terms, unfairly or deceptively interferes with the homeowner's ability to sell the home.

41. The Debtors, including the Plaintiffs, contend that the memorandum or other similar notice, which is separately signed by each homeowner under the HBA, is neither deceptive nor unfair. Rather, the memoranda and other similar notices were filed in accordance with the applicable law of each state and were intended to provide public notice of the HBA.

42. In several instances, the Defendants allege that the Plaintiffs made improper telephone solicitations to prospective customers without their consent. To date, however, the Plaintiffs have not had any meaningful opportunity to present in court the vast number of lawfully obtained consents from prospective homeowners authorizing these very solicitations.

43. It has also been alleged in many of the Primary State Actions that the Plaintniffs' sales and marketing practices "prey" upon customers who are elderly or of diminished financial means. However, the Plaintniffs strenuously disagree with such allegations as being unsupported by fact. The facts are that (a) the typical homeowner in an HBA owns a home with an average value exceeding $300,000, and (b) the average age of homeowners under HBAs is 55 years old (and 72% of homeowners are under age 65). By comparison, the American Housing Survey 2021, based on US Census Bureau data, indicates that only 67.3% of homeowners in the country are under the age of 65. Thus, the homeowners under the HBAs are proportionally younger than a typical cross-section of homeowners overall in the United States.

44. It is alleged or implied in the Primary State Actions that a very significant portion of the Plaintiffs' customers are aggrieved and have complained to state consumer protection authorities. However, this allegation is inaccurate and unsupported by the facts. For example, in North Carolina, over the 16-month period prior to the commencement of the State Action, the state consumer protection authorities made PBC FL and MV NC aware of only twelve (12) consumer complaints (out of a total of 2,100 HBAs in North Carolina) regarding allegedly deceptive conduct. These complaints came mostly from customers who alleged deception or unfairness by PBC FL and MV NC only after the homeowner had breached the HBA. In contrast, PBC FL and/or MV NC, in a mere 45-day period, following the commencement of the Primary State Action in North Carolina, obtained at least 250 sworn statements from North

Carolina homeowners attesting that they understood the key terms and elements of the HBA, including the filing of memoranda. Additionally, prior to filing its complaint the State of Florida had thirteen (13) complaints, as, upon information and belief, all complaints were shared with the Plaintiffs. In Florida, there were more than 10,000 HBAs. By contrast, the Plaintiffs have more than three hundred (300) separate sworn statements from customers attesting that they understood the terms of the HBAs.

45. It is also well worth noting that the Debtors were previously represented by national and well-recognized local law firms prior to implementing the HBP in each state, who advised as to compliance with state and other applicable laws with respect to the sales and marketing of the HBP and HBAs, as well as with respect to the terms and conditions of the HBAs and related agreements.

46. Accordingly, the Plaintiffs vigorously oppose the Primary State Actions and contend that the HBAs comply with applicable laws enacted at the relevant time the HBAs were entered with HBA Parties.

47. Other actions have been commenced by real estate regulatory commissions that include both the MV Brokerage Subs and individually licensed real estate agents and brokers in connection with their work on the HBAs.

48. In defending against the Primary State Actions and other regulatory matters, the Plaintiffs have spent and incurred substantial legal fees, and the Debtors' personnel have devoted substantial time in assisting defense counsel.

49. The Debtors commenced the Cases to protect and maximize the value of their assets and for the purpose of implementing one or more strategies aimed at alleviating or

otherwise minimizing the financial strain of and resolving the Primary State Actions. The Debtors also intend to preserve estate assets for the benefit of all creditors.

50. Although the Primary State Actions *may* include exercises of the Defendants' police or regulatory power, which may not otherwise be subject to the automatic stay in effect pursuant to 11 U.S.C. § 362(a) (the "Automatic Stay")[1], one or more of the actions taken, or remedies requested by the Defendants clearly impact or consist of actions taken to obtain or exercise control over property of the Plaintiffs. The Defendants may also seek to enforce a pecuniary interest which would be subject to the Automatic Stay.

## COUNT I

### (Injunctive Relief - Extend the Automatic Stay)

51. The Plaintiffs reallege and incorporate the allegations contained in Paragraphs 1 through 50 of this Complaint as though set forth fully herein.

52. The Plaintiffs seek an order pursuant to 11 U.S.C. § 105(a) extending the automatic stay under 11 U.S.C. §§ 362(a)(1) and 362(a)(3) to protect the Individuals and the Plaintiffs (collectively, the "Protected Parties") in the event the Defendants are determined to be exercising police or regulatory power, and in order to protect the Individuals in the event the Defendants are not exercising state or regulatory powers. The actions to be stayed include any actions taken by any of the Defendants against the Protected Parties, including, without limitation, the continuation of the Primary State Actions, and/or property of the Plaintiffs which may constitute property of the estate, as defined under 11 U.S.C. § 541(a), which may include, but not necessarily be limited to, the HBAs, recorded notices of the HBAs in the public record,

---

[1] The Plaintiffs reserve and do not waive any right to argue and otherwise assert that actions taken by one or more of the Defendants may not be an exercise of police or regulatory power.

14

and any proceeds of the HBAs, including any commissions or fees payable or paid under the HBAs or any listing agreement entered by the MV Realty Subs (collectively, "Estate Property").

53. At a minimum, the Plaintiffs request an extension of the Automatic Stay to afford time to (a) attempt to resolve the Primary State Actions, (b) formulate litigation protocols, which may involve a centralized forum to resolve the Primary State Actions, including, without limitation, before this Court as part of a claims resolution or objection process, (c) implement protocols and other provisions aimed at streamlining the Primary State Actions; and (d) review of all relevant materials by any new special litigation counsel.

54. There are other creditors and parties-in-interest impacted by the Primary State Actions, and by actions that may be taken against or otherwise involving Estate Property.

55. If the Automatic Stay is not extended, the continuation of the Primary State Actions, including any efforts to obtain or enforce claims against Estate Property, would result in irreparable harm or injury to, as well as immediate adverse economic consequences for, the Plaintiffs, their estates, Estate Property, and other creditors. By way of example, one or more of the Defendants have initiated contact with HBA Parties and other adverse publicity campaigns against the Debtors, which has resulted in impairment in value of Estate Property. This potential interference with the HBAs has likely damaged the Plaintiffs and, in some instances, damaged the Plaintiffs prior to a full and fair opportunity to present witnesses and other evidence in opposition to the Primary State Actions.

56. Under the circumstances, the Plaintiffs have a substantial likelihood of succeeding on the merits, and the issuance of an injunction and extension of the Automatic Stay is in the public interest, as the public interest supports a successful reorganization. There is no question that the Defendants seek to enforce and otherwise impair Estate Property, which is protected by

the Automatic Stay. The income stream realized on account of the HBAs, including HBA Parties who have nevertheless performed under the HBAs and listing agreements with the MV Realty Subs, could be used to fund distributions under a plan of reorganization. At this point, the Debtors' lenders, who may be impaired, support the Debtors' reorganization efforts, which could result in confirmation of a plan of reorganization, including under the cram down provisions of section 1129 of the Banrkuptcy Code.

57. Although some states have enacted legislation aimed at preventing or otherwise limiting agreements such as HBAs, upon information and belief, these statutes apply prospectively and not retroactively. Neither the Plaintiffs nor the Debtors are entering into new HBAs, and these statutes should not be used to impair the HBAs.

58. Finally, in the event the automatic stay is not extended, or an injunction is issued, to protect the Individuals, any adverse rulings against the Individuals could have preclusive effect, such as collateral estoppel, give rise to potential claims for indemnification, and divert the Individuals from the Debtors and Plaintiffs' reorganization efforts. Again, the individuals include the Debtors' chief executive officer and members of the boards of managers.

59. The harm to the Plaintiffs in the event the Automatic Stay is not extended outweighs any harm that may be suffered by the Defendants in the event the Automatic Stay is extended. By way of example, Florida filed its complaint approximately eleven (11) months ago and only recently filed its request for preliminary injunctive relief.

60. The Cases were commenced, in part, to preserve the value of Estate Property for the benefit of all creditors of the Debtors' estates and to afford the Debtors, including the Plaintiffs, a full and fair opportunity to defend the allegations asserted in the Primary State Actions, prior to Estate Property being dissipated.

61. The automatic stay should be extended to the Protected Parties.

**WHEREFORE**, the Plaintiffs respectfully request that the Court extend the Automatic Stay to stay the continuation of the Primary State Actions, as well as any actions by the Defendants against the Protected Parties, including, without limitation, Estate Property, and grant any other and further relief that the Court may deem just and appropriate.

## COUNT II

### (Injunctive Relief Pursuant to Section 105(a))

62. The Plaintiff realleges and incorporates the allegations contained in Paragraphs 1 through 61 of this Complaint as though set forth fully herein.

63. If the Defendants are permitted to continue with the Primary State Actions, or to enforce any potential claims against Estate Property, these acts would impair the ability of the Plaintiffs to reorganize and result in irreparable harm or injury to, and cause immediate adverse economic consequences for, the Plaintiffs, their estates, and Estate Property.

64. For the reasons stated herein, the Plaintiffs have a substantial likelihood of succeeding on the merits.

65. For the reasons stated herein, the issuance of an injunction is in the public interest, as the public interest supports a successful reorganization.

66. For the reasons stated herein, the harm to the Plaintiffs in the event an injunction is not issued outweighs any harm that may be suffered by the Defendant in the event an injunction is issued. The Plaintiffs are not suggesting that the Defendants will not have their day in court; rather, the Plaintiffs request an injunction to enjoin the Primary State Actions, including actions taken against Estate Property, at least on a temporary basis, so as to afford the Plaintiffs and Debtors an opportunity to resolve the Primary State Actions, or to streamline the Primary

State Actions in an effort to minimize the depletion of Estate Property, as well as time devoted by the Plaintiffs' employees. Streamlining may include, but not be limited to, litigating in a central forum – for example, *via* a claim objection process – and developing litigation and discovery protocols.

67. Upon information and belief, there are a relatively small number of consumer complaints filed with the Defendants out of the nearly 38,000 HBAs. By way of example, and upon information and belief, in the State of Florida, there are far less than 200 consumer complaints out of more than 11,000 HBSs. In fact, prior to filing its complaint, Florida had shared only 13 consumer complaints with the Debtors.

68. The Cases were filed, in part, to preserve the value of Estate Property and to minimize the substantial legal costs that have burdened the Debtors.

69. The Plaintiffs seek an injunction enjoining the Defendants from continuing with the Primary State Actions, including, without limitation, against the Protected Parties and Estate Property in the event the Automatic Stay does not otherwise apply.

**WHEREFORE**, the Plaintiffs respectfully request that the Court issue temporary and preliminary injunctive relief enjoining the Defendants from continuing with the Primary State Actions and taking any actions against the Protected Parties, as well as Estate Property, as well as any other and further relief that the Court may deem just and proper.

/s/Michael D. Seese
Michael D. Seese, Esq.
Florida Bar No. 997323
Seese, P.A.
101 NE 3rd Avenue
Suite 1500
Ft. Lauderdale, Florida 33301
Telephone: 954-745-5897
mseese@seeselaw.com

*Proposed Counsel for the Plaintiffs/Debtors*