**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| IN RE:<br><br>MV REALTY PBC, LLC, *et al.*,<br><br>　　　　Debtors. | CASE NO. 23-17590-EPK<br><br>CHAPTER 11<br><br>(Jointly Administered) |
| MV REALTY PBC, LLC, a Florida limited liability company, MV REALTY HOLDINGS, LLC, a Florida limited liability company, MV REALTY PBC, LLC, a Pennsylvania limited liability company, MV REALTY NEW JERSEY, a New Jersey limited liability company, MV REALTY OHIO, LLC, a Ohio limited liability company, MV REALTY NORTH CAROLINA, LLC, a North Carolina limited liability company, MV OF MASSACHUSETTS, a Massachusetts limited liability company, MV REALTY INDIANA, LLC, an Indiana limited liability company, and MV REALTY ILLINOIS, LLC, an Illinois limited liability company,<br><br>　　　　Plaintiffs,<br><br>v.<br><br>OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA DEPARTMENT OF LEGAL AFFAIRS, COMMONWEALTH OF MASSACHUSETTS, COMMONWEALTH OF PENNSYLVANIA (By Attorney General Joshua Shapiro), MATTHEW V. PLATKIN, | Adv. No. 23-01211-EPK |

| ATTORNEY GENERAL OF STATE OF NEW JERSEY, CARI FAIS, ACTING DIRECTOR OF THE NEW JERSEY DIVISION OF CONSUMER AFFAIRS, STATE OF NORTH CAROLINA, JOSHUA H. STEIN, ATTORNEY GENERAL, and OHIO DEPARATE OF COMMERCE, A DIVISION OF REAL ESTATE AND PROFESSIONAL LICENSING, and OFFICE OF THE ATTORNEY GENERAL, STATE OF INDIANA,<br><br>　　　Defendants. | |

## PLAINTIFFS' *EMERGENCY* MOTION FOR TEMPORARY RESTRAING ORDER AND FOR PRELIMINARY INJUNCTION

### (*EMERGENCY HEARING REQUESTED*)

> **An emergency hearing has been requested, since the relief requested is necessary (a) to avoid immediate adverse economic consequences for the Plaintiffs and property of the estate, and (b) to avoid irreparable injury to property of the Debtors' (and Plaintiffs') estate. Notwithstanding the filing of this Chapter 11 proceeding, the Defendants continue to proceed with the Primary State Actions. Deadlines in the Primary State Actions are occurring and could result in prejudice to the Plaintiffs, Debtors and the Protected Parties. The Debtors are seeking emergency retention of special litigation counsel, which will also necessitate retention of local counsel. The Plaintiffs also wish to avoid the substantial fees and costs to be incurred in the Primary State Actions and other regulatory and investigative matters, and to, among other things, afford the Plaintiffs and Defendants a reasonable and fair opportunity to attempt to resolve the Primary State Actions.**

MV Realty PBC, LLC, a Florida limited liability company ("PBC FL"), MV Realty Holdings, LLC, a Florida limited liability company ("Holdings"), MV Realty PBC, LLC, a Pennsylvania limited liability company ("PBC PA"), MV Realty New Jersey, LLC, a New Jersey limited liability company ("MV NJ"), MV Realty Ohio, LLC, an Ohio limited liability company

("MV OH"), MV Realty Noth Carolina, LLC, a North Carolina limited liability company ("MV NC"), MV of Massachusetts, LLC, a Massachusetts limited liability company ("MV MA"), MV Realty Indiana, LLC, an Indiana limited liability company ("MV IN"), and MV Realty Illinois, LLC, an Illinois limited liability company ("MV IL" and collectively with PBC PA, Holdings, MV NJ, MV OH, MV NC, MV MA, and MV IN, the "Plaintiffs"), by and through their proposed undersigned counsel, file this *Emergency Motion for Temporary Restraining Order and For Preliminary Injunction* ("Motion"), and in support of this Motion, state as follows:

## BRIEF STATEMENT OF RELIEF REQUESTED

By this Motion, the Plaintiffs request a temporary restraining order and preliminary injunction against the Office of the Attorney General, State of Florida Department of Legal Affairs ("FL"), Commonwealth of Massachusetts ("MA"), Commonwealth of Pennsylvania (By Attorney General Joshua Shapiro) ("PA"), Matthew V. Platkin, Attorney General of State of New Jersey ("Platkin"), Cari Fais, Acting Director of the New Jersey Division of Consumer Affairs ("Fais"), State of North Carolina, Joshua H. Stein, Attorney General ("NC"), and Ohio Department of Commerce, a Division of Real Estate and Professional Licensing ("OH"),  and Office of the Attorney General, State of Indiana ("IN" and collectively with Florida, Mass, PA, Platkin, Fais, NC and OH, the "Defendants").

The Plaintiffs seek entry of an order of the Court extending the automatic stay, in effect in the Plaintiffs' Chapter 11 cases pursuant to section 362(a) of the Bankruptcy Code, to protect the Individuals (defined herein), as well as a temporary restraining order and preliminary injunction under section 105 of the Bankruptcy Coode, enjoining the Primary State Actions (defined herein) for a period of not less than ninety (90) days, in order to afford the Plaintiffs a full and fair opportunity to attempt to resolve the Primary State Actions, and, in the absence of a compromise, an opportunity to present procedures, including, without limitation, discovery protocols, and possibly a central forum

in which to adjudicate the Primary State Actions. Such relief is necessary to streamline the Primary State Actions and minimize the attorneys' fees and costs, as well as the inordinate amount of time spent by the Individuals, as well as management and other employees of the Plaintiffs, in only supporting counsel defending the Primary State Actions.

The Plaintiffs have incurred millions of dollars in legal fees and costs in responding to and defending the Primary State Actions and other investigative actions. Now in Chapter 11, the ongoing legal fees and costs will have a severe and irreparable impact on the Debtors' reorganization efforts. Moreover, the relief being sought in the Primary State Actions includes efforts to exercise control over what is clearly property of the estate under section 541(a) of the Bankruptcy Code.

The relief requested is necessary and appropriate to avoid immediate and negative adverse consequences to the Debtors' estate and property of the estate and reorganization efforts. Relief is also necessary to preserve the assets of the Debtors' estate for the benefit of all creditors. Absent a compromise of the Primary State Actions, at a minimum, streamlining the Primary State Actions is beneficial to the Plaintiffs, the Debtors and creditors of the bankruptcy estate.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§157 and 1334. Venue is proper under 28 U.S.C. §§ 1408 and 1409. This is a core proceeding as defined in 28 U.S.C. §157(b)(2)(A).

2.      The statutory predicates for the relief requested herein are sections 11 U.S.C. §§ 105 and 362, and Rule 7065 of the Federal Rules of Bankruptcy Procedure.

## GENERAL BACKGROUND

### A.     *Organizational Structure*

3.      Holdings is a Florida limited liability company and the sole owner of PBC, a Florida limited liability company.

4.      PBC FL is the sole owner of the following: (a) Receivables II, a Delaware limited liability company; (b) MV Realty California, a California corporation; and (c) thirty-one (31) separate subsidiaries, each of which is a limited liability company organized under the laws of the states of Pennsylvania, South Carolina, North Carolina, Massachusetts, Illinois, Arizona, Connecticut, Georgia, New Jersey, Washington, Maryland, Virginia, Tennessee, Wisconsin, Nevada, Oregon, Utah, Minnesota, Indiana, Missouri, New York, Idaho, Alabama, Colorado, Oklahoma, Louisiana, Kansas, Michigan, Kentucky, Texas and Ohio (collectively with California, the MV Realty Subs. Each of the MV Realty Subs is incorporated or organized under the laws of the respective states: "MV Realty of California" and "MV Realty of [state], LLC" (with the exception of New York ("MV Homes of New York") and Massachusetts ("MV of Massachusetts").

**B.      _Business Operations_**

5.      PBC FL is the servicing entity, which operates primarily from premises located at 815 Broken Sound Parkway, Boca Raton, Florida 33487.

6.      PBC FL was founded in 2014 and initially operated as a traditional real estate brokerage firm. In October 2018, PBC FL began focusing its efforts on developing and marketing a unique product to residential homeowners.

7.      In or around October 2018, PBC FL implemented the "Homeowner Benefit Program" (the "HBP"). As part of the HBC, the MV Realty Subs enter "Homeowner Benefit Agreements" (the "HBA") with residential homeowners. The HBA is not a listing agreement but is a forward listing contract pursuant to which the MV Realty Subs pay an upfront cash payment to homeowners in exchange for the exclusive right to list a homeowner's home if and when the

homeowner decides to sell their home. The term of the HBA is forty (40) years subject to certain early termination events.

8.      In accordance with an HBA, a selling homeowner lists their home with the applicable MV Realty Sub, which then lists and sells the home for a standard commission, including any participating broker commission. In the event the home does not sell within six (6) months, the homeowner has an opportunity to sell the property on their own, failing which the HBA remains with the MV Realty Sub. The HBA is not a listing agreement.

9.      In the event a homeowner breaches the HBA, which results in an early termination of the HBA, the MV Realty Subs are typically entitled to a termination fee equal to three percent (3%) of the greater of (a) the fair market value of the home at the time the HBA is executed, and (b) the fair market value at the time of breach or early termination. There are other early termination events provided for under the HBAs.

10.     Additionally, the MV Realty Subs reserves the right to record a memorandum ("Memorandum"), or other similar notice, of the HBA in the public records in the county in which the real estate is located. Although the HBAs are governed by the laws of the state in which the HBA is entered, the terms of the HBAs and Memoranda are substantively consistent from state to state.

11.     At the present time, the MV Realty Subs are parties to approximately 34,000 HBAs with residential homeowners (the "HBA Parties"). The HBAs may be considered executory contracts.

### D.      *Financing – Goodwood I*

12.     On or about February 11, 2020, MV Receivables I, LLC ("Receivables I"), a wholly owned subsidiary of PBC FL, entered into a credit agreement (the "Goodwood I Credit

Agreement") with Goodwood Fund, as the initial lender ("Goodwood Fund" and, together with other lenders under the Goodwood I Credit Agreement, the "Goodwood I Lenders"), and Goodwood Inc., as agent ("Goodwood Inc."). The parties also executed, among other documents, a Security Agreement (the "Goodwood I Security Agreement" and, collectively with the Goodwood I Credit Agreement and other related documents, the "Goodwood I Loan Documents").

13.     PBC FL and Receivables I also entered a Purchase and Contribution Agreement (the "Purchase Agreement") pursuant to which Receivables I agreed to purchase HBAs acquired with amounts advanced under the terms of the Goodwood I Credit Agreement. The advance rate is typically sixty percent (60%) of discounted eligible receivables. The amount of $10,000,000.00 has been advanced under the Goodwood I Credit Agreement.

14.     Under the Goodwood I Security Agreement, Receivables I granted a security interest in and to its assets, including, without limitation, certain HBAs, accounts, receivables, and general intangibles, in favor of Goodwood Inc., as agent for the Goodwood I Lenders. PBC signed a limited guarantee of amounts owed by Receivables I under the Goodwood I Credit Agreement.

**E.     *Financing – Monroe Capital***

15.     On or about July 28, 2021, Receivables II entered into a $40,000,000.00 senior secured delayed draw credit facility (the "Monroe Credit Facility") with Monroe Capital Management Advisors, LLC, as administrative and collateral agent ("Monroe Capital"), and the lenders under the Monroe Credit Facility (collectively, the "Monroe Lenders"). Receivables II and Monroe Capital executed, among other documents, a Credit Agreement (the "Monroe Credit Agreement"), Security Agreement (the "Monroe Security Agreement", and Pledge Agreement

(the "Monroe Pledge Agreement" and, collectively with Monroe Credit Agreement, the Monroe Security Agreement, and related other agreements, the "Monroe Loan Documents").

16.    The Monroe Lenders have advanced the amount of $40,000,000.00 to Receivables II under the Monroe Credit Facility, the proceeds of which were to be used to acquire eligible receivables in accordance with the Monroe Credit Agreement and to fund operations and other related expenses.

17.    Under the Monroe Credit Facility, PBC FL, certain of the MV Realty Subs (New Jersey, Connecticut, Illinois, Massachusetts, North Carolina, South Carolina, and Georgia) (collectively, and excluding PBC, the "Initial MV Realty Guarantors") initially guaranteed the obligations of Receivables II. The Monroe Credit Facility was later guaranteed by subsequent MV Realty Subs, who organized and became parties to the Monroe Credit Facility and Monroe Loan Documents as the operation expanded.

18.    In accordance with the Monroe Pledge Agreement, (a) Holdings pledged its equity interest in PBC FL, and (b) PBC FL pledged its membership interests in the MV Realty Subs, in favor of Monroe Capital, as collateral agent. All membership interests are uncertificated.

19.    In accordance with the Monroe Security Agreement, Receivables II, PBC FL, and the Initial MV Realty Guarantors, as well as any other MV Realty Subs who later joined the Monroe Credit Facility and Monroe Loan Documents, granted Monroe Capital a security interest in their assets, including, without limitation, accounts, documents, general intangibles, investment property, receivables, and receivables relating to the HBAs.

20.    Generally speaking, (a) the MV Realty Subs would entered into HBAs with homeowners, thus giving the MV Realty Subs the exclusive right to list homes in the event a homeowner ever decide to sell their home, (b) the receivables under the HBAs were to be sold or

otherwise assigned to MV Receivables II, and (c) Monroe Capital then advanced at a rate of forty-five percent (45%) of the net present value of eligible receivables under the HBAs. Monroe is currently owed approximately $55,000,000.00.

**F.     Consent and Confirmation Agreement**

21.     In or about July 2021, Monroe, Goodwood Inc., PBC FL and Receivables I entered into the Acknowledgement and Confirmation Agreement (the "Confirmation Agreement"), which was, essentially, an inter-creditor agreement, pursuant to which Monroe and Goodwood Inc. acknowledged and consented to the other's respective rights under the Monroe Capital Loan Documents and the Goodwood I Loan Documents, respectively.

**G.     Financing - Goodwood II**

22.     On November 4, 2022, MV Receivables III, LLC ("Receivables III"), Goodwood MV Realty LP, as the initial lender ("Goodwood MV" and, together with any other related lenders, the "Goodwood II Lenders"), and Goodwood, Inc. ("Goodwood Inc."), as agent, entered into a Credit Agreement (the "Goodwood II Credit Agreement"). The parties also executed, among other documents, a Security Agreement (the "Goodwood II Security Agreement" and, collectively with the Goodwood II Credit Agreement and other related documents, the "Goodwood II Loan Documents").

23.     In accordance with the Goodwood II Credit Agreement, Receivables IIII agreed to purchase HBAs acquired with amounts advanced under the terms of the Goodwood II Credit Agreement. The advance rate was approximately sixty percent (60%) of the net present value of eligible receivables under the HBAs. The amount of $4,500,000.00 has been advanced.

24.     Under the Goodwood II Security Agreement, Receivables III granted Goodwood Inc. a security interest in and to its assets, including, without limitation, the HBAs, accounts,

receivables, and general intangibles.  MV Brokerage signed a limited guarantee of amounts owed by Receivables III under the Goodwood II Credit Agreement.

## H.   Other Financing

25**.**   In February 2023, Holdings executed senior notes with eight (8) shareholders of Holdings, who advanced a total of $12,968,000.00 (collectively, the "<u>Shareholder Notes</u>"). There is approximately $14,103,144.11 outstanding, including accrued interest, under the Shareholder Notes. The proceeds borrowed were used to fund operations.

26.   Additionally, in 2021 and 2022, Holdings executed two (2) rounds of convertible notes, one of which has since converted. The later round, which was in the total amount of $6,070,000.00, has not been converted.

## I.   Assets and Secured Obligations

27.   Monroe is currently owed approximately $55,000,000.00, while the Goodwood I Lenders and Goodwood II Lenders are owed approximately $7,408,275.82 and $4,460,000.00, respectively. As of September 5, 2023, the estimated net present value of the collateral securing the foregoing obligations is (a) $89,315,255.01 (Monroe), (b) $12,656,966.30 (Goodwood I), and (c) $6,106,069.54 (Goodwood II). Holdings has additional HBAs with an aggregate net present value of approximately $12,861,536.97. Accordingly, the total net present value of HBAs exceeds $120,000,000.00 and there is potential equity for the benefit of unsecured creditors and equity holders.

## <u>EVENTS LEADING TO BANKRUPTCY</u>

28.   From and after November 29, 2022, the Defendants commenced the Primary State Actions. In the Primary State Actions, the Defendants allege wrongdoing ranging from telemarketing violations to unfair or deceptive trade practices. The Defendants further allege that

the filing of memoranda or similar notice, which provides constructive notice to the public of the existence of the HBA and its terms, unfairly or deceptively interferes with the homeowner's ability to sell the home.

29.     The Debtors, including the Plaintiffs, contend that the memoranda or other similar notice, which is separately signed by each homeowner under the HBA, and is neither deceptive nor unfair. Rather, the memoranda and other similar notices were filed in accordance with the applicable law of each state and were intended to provide public notice of the HBA.

30.     In several instances, the Defendants allege that the Plaintiffs made improper telephone solicitations to prospective customers without their consent. To date, however, the Plaintiffs have not had any meaningful opportunity to present in court the vast number of lawfully obtained consents from prospective homeowners authorizing these very solicitations.

31.     It has also been alleged in many of the Primary State Actions that the Plaintniffs' sales and marketing practices "prey" upon customers who are elderly or of diminished financial means. However, the Plaintniffs strenuously disagree with such allegations as being unsupported by fact. The facts are that (a) the typical homeowner in an HBA owns a home with an average value exceeding $300,000, and (b) the average age of homeowners under HBAs is 55 years old (and 72% of homeowners are under age 65). By comparison, the American Housing Survey 2021, based on US Census Bureau data, indicates that only 67.3% of homeowners in the country are under the age of 65. Thus, the homeowners under the HBAs are proportionally younger than a typical cross-section of homeowners overall in the United States.

32.     It is alleged or implied in the Primary State Actions that a very significant portion of the Plaintiffs' customers are aggrieved and have complained to state consumer protection authorities.  However, this allegation is inaccurate and unsupported by the facts. For example, in

North Carolina, over the 16-month period prior to the commencement of the State Action, the state consumer protection authorities made PBC FL and MV NC aware of only twelve (12) consumer complaints (out of a total of 2,100 HBAs in North Carolina) regarding allegedly deceptive conduct. These complaints came mostly from customers who alleged deception or unfairness by PBC FL and MV NC only after the homeowner had breached the HBA. In contrast, PBC FL and/or MV NC, in a mere 45-day period, following the commencement of the Primary State Action in North Carolina, obtained at least 250 sworn statements from North Carolina homeowners attesting that they understood the key terms and elements of the HBA. Additionally, prior to filing its complaint the State of Florida had thirteen (13) complaints, as, upon information and belief, all complaints were shared with the Plaintiffs. In Florida, there were more than 10,000 HBAs. The Plaintiffs have more than three hundred (300) separate sworn statements from customers attesting that they understood the terms of the HBAs.

33.     It is also well worth noting that the Debtors were previously represented by national and well-recognized local law firms prior to implementing the HBP in each state, who advised as to compliance with state and other applicable laws with respect to the sales and marketing of the HBP and HBAs, as well as with respect to the terms and conditions of the HBAs and related agreements. In fact, in early 2022, the Debtors meet with state attorney generals in reviewing all aspects of the HBP, and no issues were raised with respect to the program.

34.     Accordingly, the Plaintiffs vigorously oppose the Primary State Actions and contend that the HBAs comply with applicable laws enacted at the relevant time the HBAs were entered with HBA Parties.

35.     Other actions have been commenced by real estate regulatory commissions that include both the MV Brokerage Subs and individually licensed real estate agents and brokers in connection with their work on the HBAs. These actions potentially threaten the livelihood of the affected agents and/or brokers.

36.     The Debtors commenced the Cases to protect and maximize the value of their assets and for the purpose of implementing one or more strategies aimed at resolving or alleviating or otherwise minimizing the financial strain of the Primary State Actions. The Debtors also intend to preserve estate assets for the benefit of all creditors.

37.     Although the Primary State Actions *may* include exercises of the Defendants' police or regulatory power, which may not otherwise be subject to the automatic stay in effect pursuant to 11 U.S.C. § 362(a) (the "Automatic Stay")[1], one or more of the actions taken, or remedies requested by the Defendants clearly impact or consist of actions taken to obtain or exercise control over property of the Plaintiffs. The Defendants may also seek to enforce a pecuniary interest which would be subject to the Automatic Stay.

## RELIEF REQUESTED

38.     The Plaintiffs seek entry of a temporary restraining order and preliminary injunction (a) extending the Automatic Stay to protect the Protected Parties from the continuation of the Primary State Actions, as well as any actions by the Defendants against Estate Property, and (b) enjoining the Defendants from continuing with the Primary State Actions and taking any actions against the Protected Parties, as well as Estate Property.

---

[1] The Plaintiffs reserve and do not waive any right to argue that actions taken by one or more of the Defendants may not be an exercise of police and/or regulatory power.

## <u>AUTHORITY IN SUPPORT OF RELIEF REQUESTED</u>

**A.**    ***Extension of the Automatic Stay***

39.    "[I]t is well settled that bankruptcy courts may extend the automatic stay to "enjoin suits by third parties against third parties if they threaten or thwart or frustrate the debtor's reorganization efforts." *In re Calpine Corp.*, 354 B.R. 45, 48 (Bankr. S.D.N.Y. 2006); *see also Coscarelli v. Esquared Hosp., LLC*, No. 18-CV-5943 (JMF), 2021 U.S. Dist. LEXIS 16648, *10-11 (S.D.N.Y. Jan. 28, 2021) ("It generally applies only where 'a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate") (*quoting Queenie, Ltd. V. Nygard Int'l.* 321F.3d 282, 287-88 (2d Cir. 2003); *see also SVB Fin. Grp. V. UBS Sec., LLC,* Adv. Proc. No. 23-1091 (MG), 2023 Bankr. LEXIS 1027, *14 (Bankr. S.D.N.Y. Apr. 14, 2023) ("Although section 362(a) operates primarily as a shield for the debtor, courts can, and do, extend its protection to non-debtors in various circumstances, including where an action against the non-debtor will have an immediate adverse economic consequence for the debtor's estate.") (citing *Queenie, Ltd. v. Nygard Int'l.,* 321 F.3d 282, 287 (2d Cir. 2003).

40.    Here, the Primary State Actions unequivocally "thwart or frustrate" the Debtors' reorganization efforts and have an "immediate adverse economic consequence" for the Debtors' and Plaintiffs' estate. The Defendants seek to exercise control over property of the Debtors' estate, such as by seeking the cancellation of Memoranda and other notices, restricting enforcement of the Debtors' contractual rights under the HBA, as well as other property rights of the Debtors. In one instance, one of the states seeks to establish, on an expedited basis, a constructive trust over property of the estate.

41.    The Debtors, including the Plaintiffs, have spent millions of dollars in legal fees and costs in defending the Primary State Actions and other regulatory matters. The Debtors,

including the Plaintiffs, have also hired local counsel across the country necessary in defending the Primary State Actions. Finally, notwithstanding the filing of these Chapter 11 cases, at least one of the Defendants has aggressively pursued its Primary State Actions since the filing of the Chapter 11 cases.

42.     The Debtors have filed an *Emergency Application for Entry of Order Authorizing Employment of Saul Ewing, LLP as Special Counsel for Debtors-in-Possession, in State Litigation, Regulatory, and Investigate Matters, Effective October 3, 2023* [ECF No. 53] (the "SE Application"). The SE Application is scheduled for a hearing on October 11, 2023, at 2:30 p.m.  Saul Ewing, LLP ("SE") is being retained to replace the Debtors' prior counsel. When counsel for one of the States was contacted regarding an extension of certain deadlines in a matter that has been pending for nearly one year, opposing counsel refused to agree to any extension, whatsoever, and went so far as to express that counsel would consent to the withdrawal of the Debtors' prior counsel, so long as the Debtors' prior counsel did not seek any stays or extension. However, new special litigation counsel needs time to review all related materials and confer with the Debtors, the chief restructuring officer, and undersigned counsel.

43.     This particular Defendant waited nearly ten (10) months after filing its complaint to seek injunctive relief; now, however, the State is unwilling to agree to any extension in order to afford the Debtors an opportunity to retain new counsel or to permit settlement negotiations.

44.     "[O]rdinarily, creditors must come to the Court to obtain a ruling regarding the effect of the automatic stay on their rights before proceeding to exercise same *including governmental entities*."  *Steffy v. Ark ex rel. McDanial (In re Steffy)*, 494 B.R. 574, 585 (Bankr. N.D. Ga. 2012) (emphasis added).  Only one of the states has filed such a motion, yet at least two

(2) courts presiding over Primary State Actions may have raised the possibility that the automatic stay may apply, at least in part.

45.     Furthermore, "the automatic stay allows the bankruptcy court to centralize all disputes concerning property of the debtor's estate in the bankruptcy court so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." *In re: Ionosphere Clubs*, 922 F.2d 984, 989 (2nd Cir. 1990). "The Bankruptcy Code 'provides for centralized jurisdiction and administration of the debtor, its estate and its reorganization in the Bankruptcy Court, and [this policy] is effectuated by Sections 362 and 105 of the Code.'" *Id.* (*quoting In re: Chateaugay Corp.*, 109 Bankr. 613, 621 (S.D.N.Y. 1990).  Indeed, "[o]ne of the primary purposes of the automatic stay is to prevent a piecemeal dismantling of the bankruptcy estate and avoid the cost of defending against such actions in another forum." *Steffy v. Ark. ex rel. McDaniel (In re Steffy)*, 494 B.R. 574, 585 (Bankr. N.D. Ga. 2012).

46.     Here, the Primary State Actions are pending in seven (7) states, not including investigations ongoing in fourteen (14) states. In total, there are more than thirty (30) lawsuits, regulatory, and investigative matters pending with overlapping discovery and common factual and legal issues. Not only are the decentralized actions significantly burdensome from a cost standpoint, but the Plaintiffs' management and employees have spent, and continue to spend an inordinate and distracting amount of time supporting defense counsel and responding to the Primary State Actions and other regulatory matters.

47.     "[Section] 362(a)(3) is not limited to actions against the debtor but instead stays 'any act to obtain possession of property of the of the estate or of property from the estate or to exercise control over property of estate,' and courts have applied the (a)(3) stay to non-debtor actions that 'have an adverse impact on property of the estate.'" *In re: Jefferson County,* 491

B.R. 277, 295 (Bankr. S.D. Ala. 2013). Some Defendants have even actively sought to discredit the Debtors and the validity of the HBAs, by methods including direct communications to consumers and "townhall" Zoom™ calls.

48.     While some states have expressed the "urgency" in proceeding with the Primary State Actions, only a single state now has a pending request for injunctive relief, a request filed ten (10) months after filing its complaint. In this proceeding, it was reported by former counsel to the Debtors that the presiding judge commented that some actions sought by the State may possibly be constrained or otherwise impacted by the bankruptcy filing. In another Primary State Action, the court issued an order, *sua sponte*, for a period of thirty (30) days to consider the possible application of the automatic stay. There, the court had recently issued an injunction ordering the termination or invalidation of contractual rights belonging to the Debtors including cancellation or removal of the recorded memoranda or other notices at considerable cost to the Debtors.

49.     Extension of the automatic stay to non-debtor parties is necessary to avoid immediate harm to the Debtors' estate. "[T]the automatic stay can apply to non-debtors but 'normally does so only when a claim against the non-debtor will have an *immediate adverse economic consequence for the debtor's estate*." *In re: Chord Assocs. LLC v. Protech 2003-D, LLC*, No. 07-5138 (JFB) (AKT), 2010 U.S. Dist. LEXIS 28465, *28 (E.D.N.Y., Mar. 25, 2010) (emphasis in original). Here, the Primary State Actions against the Individuals could have a detrimental impact on the Debtors, including the Plaintiffs.

50.     By way of example, one of the Individuals is the Debtors' chief executive officer and manager. In a § 105 context, one court noted that "a court should consider, among other relevant factors, whether the suits would (i) threaten the debtor's insurance coverage, (ii)

*increase the debtor's indemnification liability*, (iii) result in inconsistent judgments, (iv) *expose the debtor to risks of collateral estoppel or res judicata,* and (iv) burden and distract the debtor's management by diverting its manpower from reorganization to defending litigation." *McHale v. Alvarez (In re 1031 Tax Group, LLC)*, 397 B.R. 670, 684 (Bankr. S.D.N.Y. 2008) (emphasis added). This is precisely the situation the Debtors and Plaintiffs face, to wit: insiders are named defendants in the same actions as the Debtors, and if the automatic stay is not extended, at a minimum, senior members of management are being diverted away from the business, and, worse, an adverse judgment could give rise to indemnification claims and have possible preclusive effect.

51.     Extension of the automatic stay to the Protected Parties is necessary to avoid an immediate adverse economic consequence to the estate and the Debtor's (and Plaintiffs) reorganization efforts in matters involving a state's police power. In *LTL Mgmt., LLC v. New Mexico (In re LTD Mgmt., LLC)*, 645 Bankr. 59, 81 (Bankr. D.N.J. 2022), the bankruptcy court found that "the exercise of the State's police power seriously conflicts with the policies underlying the Bankruptcy Code. Therefore, § 362(b)(4)'s prevention of the 'automatic' stay upon the filing of the bankruptcy does not bar this Court from imposing or extending the stay under § 362(a)[.]"; *see also Penn Terra, Ltd. V. Dept. of Environmental Resources,* 733 F.2d 267, 273 (3d Cir. 1983)("the exercise of State power, even for the protection of the public health and safety, may run so contrary to the policy of the Bankruptcy Code that it should not be permitted.").

52.     Only one of the Defendants in the Primary State Actions has filed a request with the Court seeking a determination that the automatic stay does not apply. However, respectfully, the request falls short and does not end the inquiry. Specifically, if the automatic stay is not

extended to the Protected Parties, the continuation of the Primary State Actions will have an immediate adverse economic consequence to the estate and the Debtor's (and Plaintiffs) reorganization efforts.

**B.    *Section 105 Injunction***

53.    Section 105 of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title [11]." *See* 11 U.S.C. § 105.  "No one considering this matter objectively disputes the power of a bankruptcy court, under section 105(a) of the Code, to enjoin acts against third parties when they impair a debtor's ability to reorganize in a chapter 11 case – even though such acts are not proscribed by the automatic stay of section 362 of the Code." *Lyondell Chem. Co. v. Centerpoint Energy Gas Servcs. (In re Lyondell Chem. Co.*), 402 B.R. 571, 587 (Bankr. S.D.N.Y. 2009)[2].

54.    In considering a "105 injunction," the Court should evaluate the following factors:  "(1) whether there is a likelihood of successful reorganization; (2) whether there is an imminent irreparable harm to the estate in the absence of an injunction; (3) whether the balance of harms tips in favor of the moving party; and (4) whether the public interest weighs in favor of an injunction." *Nevada Power Co. v. Calpine Corp. (In re: Calpine Corp.)*, 365 B.R. 401 409 (S.D.N.Y. 2007). In *Calpine*, the district court noted the bankruptcy court's reference to a "limited exception" to the imminent irreparable harm requirement that "permits the court to issue a 'preliminary injunction in the bankruptcy context where the action threatens the reorganization process.'" *Id.* (citation omitted); *see also In re Neuman*, 71 B.R. 567, 571 (S.D.N.Y. 1987)

---

[2] Rule 7065 of the Federal Rules of Bankruptcy Procedure incorporates Rule 65 of the Federal Rules of Civil Procedure. *See* Rule 7065, Fed. R. Bankr. P.  However, a "temporary restraining order or preliminary injunction may be issued on application of a debtor … or debtor in possession without compliance with Rule 65(c). *See* Rule 7065. Rule 65(c) addresses the requirement of posting a bond or other security as a requirement for the issuance of a restraining order or preliminary injunction.

("Since injunctions in bankruptcy cases are authorized by statute, the usual equitable grounds for relief, such as irreparable damage, need not be shown." (citation omitted). "Section 105(a) contemplates injunctive relief in 'precisely those instances where parties are attempting to obstruct the reorganization.'" *Id.* at 571-72 (*quoting In re: Johns-Mansville Corp.*, 52 Bankr. 879 (Bankr. S.D.N.Y. 1985).

55.     In *Calpine*, the bankruptcy court found "three separate irreparable harms in the absence of a stay . . .: (1) the 'risk of collateral estoppel and evidentiary prejudice' . . . (2) 'a drain on its estate due to its indemnification obligations . . .'; and (3) a 'significant burden and distraction of key employees from its restructuring efforts.'" *Id.* at 410.

56.     Here, there is no question that continuation of the Primary State Actions will cause "irreparable harm" to the Debtors' estate. If the Primary State Actions are not stayed with respect to the Individuals, there is a risk of indemnification and collateral estoppel and evidentiary prejudice. Moreover, the Debtors' chief executive officer and other key employees have been and will continue to be distracted from the Debtors' reorganization efforts. *See Mchale v. Alvarez (In re 1031 Tax Group, LLC)*, 397 B.R. 670, 684 (Bankr. S.D.N.Y. 2008) (a factor to consider is whether the action would "burden and distract the debtor's management by diverting its manpower from reorganization to defending litigation.").

57.     The Primary State Actions, if permitted to continue without a stay or a 105 injunction will seriously jeopardize the Debtors' reorganization efforts.  Assuming, *arguendo*, that the Primary State Actions are an exercise of the States' police power, "[i]t is clear from the legislative history and case law that lawsuits which are exempt from the automatic stay may, under appropriate circumstances, be enjoined by the bankruptcy court pursuant to 11 U.S.C. § 105." *Brennan v. Poritz (In re Brennan)*, 198 B.R. 445, 449 (D.N.J. 1996) (citing to H.R. Rep.

No. 95-595, at 342 (1978) ("By excepting an act or action from the automatic stay, the bill simply requires that the trustee move the court into action, rather than requiring the stayed party to request relief from the stay.").

58.     In *Brennan*, the district court cited to *Penn Terra, Ltd. v. Dept. of Environmental Resources,* 733 F.2d 267 (3d Cir. 1984) in noting that "a § 105 injunction of state police power exercise is appropriate only in limited situations where there is a serious conflict between the exercise of state power and the policy of the bankruptcy code." *Brennan*, 198 B.R. at 450. Again, the continuation of the Primary State Actions (and other regulatory actions), which, again, consists of over thirty (30) matters, will have significant adverse economic consequences for the Debtors' estate. Not only will the Debtors incur millions more in legal fees and costs, but members of senior management will be diverted from the reorganization efforts. Furthermore, at least one state is seeking to exercise control over property of the Debtors' estate in direct and absolute conflict with the policies of the Bankruptcy Code.

59.     In *Billing Res. V. FTC (In re Billing Res.)*, No. 07-52890-ASW, 2007 Bankr. LEXIS 3789, *31-2 (Bankr. N.D. Cal. Nov. 2, 2007), the bankruptcy court held that a bankruptcy court "has the legal authority to enjoin prosecution of governmental actions against a debtor that falls within the regulatory and police powers exception of Bankruptcy Code section 362(b)(4)." The *Billing* court went on to find that such an injunction was appropriate when "a governmental action seeks actual physical control over the assets of the debtor's estate[, which] threatens the bankruptcy court's exclusive jurisdiction over the *res* of the debtor's estate" and "in other circumstances that severely threaten the integrity of the bankruptcy process." *Id.* at 32. In fact, the *Billing* court noted that "[a] few courts have enjoined regulatory or police powers actions on the grounds that the costs of defending the actions at issue, both in terms of money

spent on lawyers' fees and time taken away from focusing on reorganization, were so high in comparison to the estate that allowing the actions to continue constituted a 'threat' to the estate." *Id.* at 33.

60.     Again, the Primary State Actions, if not stayed, "threaten the integrity of the bankruptcy process" and result in significant costs to the estate, both in economic terms and in the diversion of key personnel. A stay is appropriate under the circumstances.

61.     When considering the factors ordinarily considered when determining whether injunctive relief is appropriate, the Plaintiffs can demonstrate a "reasonable likelihood of a successful resolution to the chapter 11 case." *SVB Fin. Grp. v. UBS Sec., LLC*, No. 23-10367 (MG), 2023 Bankr. LEXIS 1027, *23 (Bankr. S.D.N.Y. 2023).  A debtor "may be considered likely to succeed so long as the prospects of reorganization remain viable and if the Debtors are substantially more likely to reorganize with the injunction in place." *Id.*  "[C]ourts afford the debtor the benefit of the doubt so long as the case is generally on track, '[e]specially since emergency requests to protect an estate's ability to reorganize often come up in a chapter 11 case's earliest stages, [and] there is no way to predict what will ultimately happen in a large chapter 11 case as new issues arise.'" *Id.*

62.     Having already discussed "irreparable harm and injury," the harm to the Plaintiffs and Debtors is significant in the absence of a stay, while the harm to the Defendants is minimal. Here, the Plaintiffs have had very little, if any, opportunity to present evidence in opposition to the Primary State Actions. Since filing the Primary State Actions there is now only one pending request for injunctive relief – in part, to exercise control over property of the estate. And, the Plaintiffs are no longer entering into HBAs; at this point, the Debtors are servicing the existing HBAs. On the other hand, if no stay or inunction is issued, the Debtors will be forced to incur

what will likely be millions of dollars in fees and costs and, if they ultimately prevail, or a compromise is entered down the road, the Debtors will have already suffered irreparable harm and significant, adverse economic consequences.

63.     Finally, the public interest will be served by issuing a stay or injunctive relief, since the "relevant public interest is the interest in successful reorganizations, since reorganizations preserve value for creditors and ultimately the public.'" *SVP Fin. Grp.,* 2023 Bankr. LEXIS, at *35. In the Debtors' case, a reorganization will benefit creditors and is in the public interest.  Moreover, from a public interest perspective, a stay does not necessarily mean that the Defendants will not have their day in court.  But, in the absence of a settlement of the Primary State Actions, it is certainly possible that a more cost-efficient and streamlined process for adjudicating such claims can be achieved at considerable cost savings for the estate and creditors.

64.     The issuance of a 105 Injunction is necessary and appropriate under the circumstances of this case. The Primary State Actions should be stayed.

**WHEREFORE,** the Debtors respectfully request that this Court (a) conduct an emergency hearing and issue a temporary restraining order against the Defendant, (b) scheduling a preliminary hearing on the Motion, and (c) issue a preliminary injunction pending a trial on the issuance of a permanent injunction, as well as granting such other and further relief that the Court may deem just and proper.

**RESPECTFULLY SUBMITTED** this 11th day of October, 2023.

*I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).*

## CERTIFICATE OF EXIGENT CIRCUMSTANCES

**I HEREBY CERTIFY** that an emergency hearing has been requested, since the relief

23

requested is necessary (a) to avoid immediate adverse economic consequences for the Plaintiffs and property of the estate, and (b) to avoid irreparable injury to property of the estate and the Plaintiffs (and Debtors). Deadlines in the Primary State Actions are occurring and could result in prejudice to the Plaintiffs, Debtors and the Protected Parties. The Debtors are seeking emergency retention of special litigation counsel, which will also necessitate retention of local counsel. The Plaintiffs also wish to avoid the substantial fees and costs to be incurred in the Primary State Actions and other regulatory and investigative matters, and to, among other things, afford the Plaintiffs and Defendants a reasonable and fair opportunity to attempt to resolve the Primary State Actions.

**SEESE, P.A.**
Proposed Attorneys for Plaintiffs
101 N.E. 3rd Avenue
Suite 1500
Ft. Lauderdale, Florida 33301
Telephone: (954) 745-5897

By: ___***s/Michael D. Seese***___
     Michael D. Seese, Esq.
     Fla. Bar No. 997323
     mseese@seeselaw.com