**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| IN RE:<br><br>MV REALTY PBC, LLC, *et al.*,<br><br>      Debtors. | CASE NO. 23-17590-EPK<br><br>CHAPTER 11<br><br>(Jointly Administered) |
| MV REALTY PBC, LLC, a Florida limited liability company, *et al.*,<br><br>      Plaintiffs,<br><br>vs.<br><br>OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA DEPARTMENT OF LEGAL AFFAIRS, *et al.*,<br><br>      Defendants. | ADV. NO. 23-01211-EPK |

## AMENDED ADVERSARY COMPLAINT
## FOR INJUNCTIVE RELIEF

MV Realty PBC, LLC, a Florida limited liability company ("PBC FL"), MV Realty Holdings, LLC, a Florida limited liability company ("Holdings"), MV Realty PBC, LLC, a Pennsylvania limited liability company ("PBC PA"), MV Realty New Jersey, LLC, a New Jersey limited liability company ("MV NJ"), MV Realty Ohio, LLC, an Ohio limited liability company ("MV OH"), MV Realty Noth Carolina, LLC, a North Carolina limited liability company ("MV NC"), MV of Massachusetts, LLC, a Massachusetts limited liability company ("MV MA"), MV Realty Indiana, LLC, an Indiana limited liability company ("MV IN"), and MV Realty Illinois, LLC, an Illinois limited liability company ("MV IL" and collectively with PBC PA, Holdings,

MV NJ, MV OH, MV NC, MV MA, and MV IN, the "Plaintiffs"), file this adversary complaint (the "Complaint") against Office of the Attorney General, State of Florida Department of Legal Affairs ("FL"), Commonwealth of Massachusetts ("MA"), Commonwealth of Pennsylvania (By Attorney General Joshua Shapiro) ("PA"), Matthew V. Platkin, Attorney General of State of New Jersey ("Platkin"), Cari Fais, Acting Director of the New Jersey Division of Consumer Affairs ("Fais"), State of North Carolina, Joshua H. Stein, Attorney General ("NC"), and Ohio Department of Commerce, a Division of Real Estate and Professional Licensing ("OH"), and Office of the Attorney General, State of Indiana ("IN" and collectively with Florida, Mass, PA, Platkin, Fais, NC and OH, the "Defendants"), and state as follows:

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b).  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

3.    The statutory predicates for the relief requested in this Complaint are Bankruptcy Code §§ 105(a), 362(a) and Rule 7065 of the Federal Rules of Bankruptcy Procedure.

## THE PARTIES

4.    On September 13, 2023, each of the Plaintiffs filed a voluntary petition under Chapter 11 of Title 11 of the United States Code. The above-captioned Chapter 11 cases (collectively, the "Cases") are being jointly administered under lead case, *In re: MV Realty PBC, LLC, Case No. 23-17590-EPK* (the "Case"). Each of the Plaintiffs continues in possession of its assets as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108. The Plaintiffs are the debtors and debtors-in-possession in the Cases.

5.    The State of Florida, Department of Legal Affairs is, upon information and belief, a department within the Office of the Attorney General for the State of Florida, overseen by the

Attorney General, The Honorable Ashley Moody, and is the State plaintiff in Case No. 22-CA009958 (the "Florida Action"), an action pending against PBC FL, Amanda Zachman ("Ms. Zachman"), Antony Mitchell  ("Mr. Mitchell"), and David Manchester ("Mr. Manchester").

6.      The Commonwealth of Massachusetts is a state in the United States of America, and is the State plaintiff, by and through its Attorney General, The Honorable Maura Healey, in Case No. 2284CV02823-BLS (the "Massachusetts Action"), an action pending against PBC FL and MV MA.

7.      The Commonwealth of Pennsylvania is a state in the United States of America, and by and through its Attorney General, The Honorable Joshua Shapiro, is the State plaintiff in Case No. 221201288 (the "Pennsylvania Action"), an action pending against PBC PA and Ms. Zachman.

8.      The Honorable Matthew V. Platkin, is the acting Attorney General of the State of New Jersey and is a State plaintiff in Case No. EX-C-000080-23 (the "New Jersey Action"), an action pending against PBC PA, MV NJ, Ms. Zachman, Mr. Manchester, Mr. Mitchell, and David Reiner ("Mr. Reiner").

9.      Cari Fais is the acting director of the New Jersey Division of Consumer Affairs and is a State plaintiff in the New Jersey Action.

10.      The State of North Carolina is a state within the United States of America, and by and through its Attorney General, The Honorable Joshua H. Stein, is the State plaintiff in Case No. 23CV006408-910 (the "North Carolina Action"), an action pending against PBC FL, MV NC, Ms. Zachman, Mr. Mitchell, Mr. Manchester, and Darryl Cook ("Mr. Cook").

11.      The State of Ohio, Ohio Department of Commerce, Division of Real Estate and Professional Licensing, is the State plaintiff in Case No. 23-CV-963 (the "Ohio Action"), an action pending against MV OH, Ms. Zachman and Diana Remar ("Ms. Remar").

12.     The State of Indiana is a state within the United States of America, and by and through its Attorney General, The Honorable Todd Rokita, is the State plaintiff in Case No. CV-01578-MPB-MG (the "Indiana Action" and, collectively with the Florida Action, Massachusetts Action, Pennsylvania Action, New Jersey Action, North Carolina Action, and Ohio Action, the "Primary State Actions").

13.     Although not named Plaintiffs, the following individuals are named defendants in one or more of the Primary State Actions (collectively, the "Individual Defendants"): (a) Mr. Mitchell is the chief executive officer or manager of the Debtors, (b) Ms. Zachman is a member of the board of managers of one or more of the Debtors, (c) Mr. Manchester is a member of the board of managers of one or more of the Debtors, (d) Mr. Reiner is a real estate broker in New Jersey, (e) Mr. Cook is a real estate broker in North Carolina, and (f) Ms. Remar is a real estate broker in Ohio.

## GENERAL ALLEGATIONS

### A.   *Organizational Structure*

14.     Holdings is a Florida limited liability company and the sole owner of PBC FL.

15.     PBC FL is the sole owner of the following: (a) Receivables II, a Delaware limited liability company; (b) Receivables III, a Delaware limited liability company; (c) MV Realty California, a California corporation ("MV CA"); and (d) thirty-one (31) separate subsidiaries, each of which is a limited liability company organized under the laws of the states of Pennsylvania, South Carolina, North Carolina, Massachusetts, Illinois, Arizona, Connecticut, Georgia, New Jersey, Washington, Maryland, Virginia, Tennessee, Wisconsin, Nevada, Oregon, Utah, Minnesota, Indiana, Missouri, New York, Idaho, Alabama, Colorado, Oklahoma, Louisiana, Kansas, Michigan, Kentucky, Texas and Ohio (collectively with MV CA, the "MV Realty Subs". The MV Realty Subs include MV MA, MV NC, MV NJ, MV IN, MV IN and MV

OH. Each of the MV Realty Subs is incorporated or organized under the laws of the respective states: "MV Realty of California" and "MV Realty of [state], LLC" (with the exception of New York ("MV Homes of New York") and Massachusetts ("MV of Massachusetts").

## B.    *Business Operations*

16.     PBC FL is the servicing entity, which operates primarily from premises located at 815 Broken Sound Parkway, Boca Raton, Florida 33487.

17.     PBC FL was founded in 2014 and initially operated as a traditional real estate brokerage firm. In October 2018, PBC FL began focusing its efforts on marketing a unique product to residential homeowners.

18.     In or around October 2018, PBC FL implemented the "Homeowner Benefit Program" (the "HBP"). As part of the HBC, the MV Realty Subs enter HBAs with residential homeowners. The HBA is not a listing agreement but is a contract pursuant to which the MV Realty Subs pay an upfront cash payment to homeowners in exchange for the exclusive right to list a homeowner's home if the homeowner ever decides to sell their home. The term of the HBA is forty (40) years subject to certain early termination events.

19.     In accordance with an HBA, a selling homeowner lists their home with the applicable MV Realty Sub, or its assignee, which then lists and sells the home for a standard 6% commission, typically 3% paid to the listing agent and 3% paid to the buyer's agent. In the event the home does not sell within six (6) months, the homeowner has an opportunity to sell the property on their own for a period of sixty (60) days, subject to certain requirements, failing which the HBA rights remain with the MV Realty Sub.

20.     In the event a homeowner breaches the HBA, the MV Realty Subs may be entitled to a termination fee or liquidated damages typically equal to three percent (3%) (the

same amount to which the MV Realty Sub would have earned as a commission) of the greater of (a) the fair market value of the home at the time the HBA is entered, or (b) the fair market value at the time of breach or early termination. There are other early termination events provided for under the HBAs.

21.      Additionally, each of the MV Realty Subs reserves the right to record a memorandum ("Memorandum"), which is executed separately by the homeowner, or other similar notice of the HBA in the public records in the county in which the real estate is located. Neither the HBA nor the Memorandum creates any current lien against a homeowner's property at the time the HBA is executed.

22.      At the present time, the MV Realty Subs are parties to approximately 34,000 HBAs with residential homeowners (the "HBA Parties"). A list of active HBAs, by state, is attached hereto as **Exhibit "A".**

### D.      *Financing – Goodwood I*

23.      On or about February 11, 2020, MV Receivables I, LLC ("Receivables I"), a wholly owned subsidiary of PBC FL, entered into a credit agreement (the "Goodwood I Credit Agreement") with Goodwood Fund, as the initial lender ("Goodwood Fund" and, together with other lenders under the Goodwood I Credit Agreement, the "Goodwood I Lenders"), and Goodwood Inc., as agent ("Goodwood Inc."). The parties also executed, among other documents, a Security Agreement (the "Goodwood I Security Agreement" and, collectively with the Goodwood I Credit Agreement and other related documents, the "Goodwood I Loan Documents").

24.      PBC FL and Receivables I also entered a Purchase and Contribution Agreement (the "Purchase Agreement") pursuant to which Receivables I agreed to purchase HBAs acquired

with amounts advanced under the terms of the Goodwood I Credit Agreement. The advance rate is typically sixty percent (60%) of discounted eligible receivables. The amount of $10,000,000.00 has been advanced under the Goodwood I Credit Agreement.

25.     Under the Goodwood I Security Agreement, Receivables I granted a security interest in and to its assets, including, without limitation, certain HBAs, accounts, receivables, and general intangibles, in favor of Goodwood Inc., as agent for the Goodwood I Lenders. PBC signed a limited guarantee of amounts owed by Receivables I under the Goodwood I Credit Agreement.

### E.      *Financing – Monroe Capital*

26.     On or about July 28, 2021, Receivables II entered into a $40,000,000.00 senior secured delayed draw credit facility (the "Monroe Credit Facility") with Monroe Capital Management Advisors, LLC, as administrative and collateral agent ("Monroe Capital"), and the lenders under the Monroe Credit Facility (collectively, the "Monroe Lenders"). Receivables II and Monroe Capital executed, among other documents, a Credit Agreement (the "Monroe Credit Agreement"), Security Agreement (the "Monroe Security Agreement", and Pledge Agreement (the "Monroe Pledge Agreement" and, collectively with Monroe Credit Agreement, the Monroe Security Agreement, and related other agreements, the "Monroe Loan Documents").

27.     The Monroe Lenders have advanced the amount of $40,000,000.00 to Receivables II under the Monroe Credit Facility, the proceeds of which were to be used to acquire eligible receivables in accordance with the Monroe Credit Agreement and to fund operations and other related expenses.

28.     Under the Monroe Credit Facility, PBC FL, certain of the MV Realty Subs (New Jersey, Connecticut, Illinois, Massachusetts, North Carolina, South Carolina, and Georgia)

(collectively, and excluding PBC, the "Initial MV Realty Guarantors") initially guaranteed the obligations of Receivables II. The Monroe Credit Facility was later guaranteed by subsequent MV Realty Subs, who organized and became parties to the Monroe Credit Facility and Monroe Loan Documents as the operation expanded.

29.    In accordance with the Monroe Pledge Agreement, (a) Holdings pledged its equity interest in PBC FL, and (b) PBC FL pledged its membership interests in the MV Realty Subs, in favor of Monroe Capital, as collateral agent. All membership interests are uncertificated.

30.    In accordance with the Monroe Security Agreement, Receivables II, PBC FL, and the Initial MV Realty Guarantors, as well as any other MV Realty Subs who later joined the Monroe Credit Facility and Monroe Loan Documents, granted Monroe Capital a security interest in their assets, including, without limitation, accounts, documents, general intangibles, investment property, receivables, and receivables relating to the HBAs.

31.    Generally speaking, (a) the MV Realty Subs would entered into HBAs with homeowners, thus giving the MV Realty Subs the exclusive right to list homes in the event a homeowner ever decide to sell their home, (b) the receivables under the HBAs were to be sold or otherwise assigned to MV Receivables II, and (c) Monroe Capital then advanced at a rate of forty-five percent (45%) of the net present value of eligible receivables under the HBAs. Monroe is currently owed approximately $55,000,000.00.

## F.    Consent and Confirmation Agreement

32.    In or about July 2021, Monroe, Goodwood Inc., PBC FL and Receivables I entered into the Acknowledgement and Confirmation Agreement (the "Confirmation Agreement"), which was, essentially, an inter-creditor agreement, pursuant to which Monroe and

Goodwood Inc. acknowledged and consented to the other's respective rights under the Monroe Capital Loan Documents and the Goodwood I Loan Documents, respectively.

**G.      *Financing - Goodwood II***

33.      On November 4, 2022, MV Receivables III, LLC ("Receivables III"), Goodwood MV Realty LP, as the initial lender ("Goodwood MV" and, together with any other related lenders, the "Goodwood II Lenders"), and Goodwood, Inc. ("Goodwood Inc."), as agent, entered into a Credit Agreement (the "Goodwood II Credit Agreement"). The parties also executed, among other documents, a Security Agreement (the "Goodwood II Security Agreement" and, collectively with the Goodwood II Credit Agreement and other related documents, the "Goodwood II Loan Documents").

34.      In accordance with the Goodwood II Credit Agreement, Receivables IIII agreed to purchase HBAs acquired with amounts advanced under the terms of the Goodwood II Credit Agreement. The advance rate was approximately sixty percent (60%) of the net present value of eligible receivables under the HBAs. The amount of $4,500,000.00 has been advanced.

35.      Under the Goodwood II Security Agreement, Receivables III granted Goodwood Inc. a security interest in and to its assets, including, without limitation, the HBAs, accounts, receivables, and general intangibles.  MV Brokerage signed a limited guarantee of amounts owed by Receivables III under the Goodwood II Credit Agreement.

**H.      *Other Financing***

36**.**      In February 2023, Holdings executed senior notes with eight (8) shareholders of Holdings, who advanced a total of $12,968,000.00 (collectively, the "Shareholder Notes"). There is approximately $14,103,144.11 outstanding, including accrued interest, under the Shareholder Notes. The proceeds borrowed were used to fund operations.

37.     Additionally, in 2021 and 2022, Holdings executed two (2) rounds of convertible notes, one of which converted. The later round, which was in the total amount of $6,070,000.00, has not been converted.

## I.     *Assets and Secured Obligations*

38.     Monroe is currently owed approximately $44,800,000.00, while the Goodwood I Lenders and Goodwood II Lenders are owed approximately $7,408,275.82 and $4,460,000.00, respectively. As of September 5, 2023, the estimated net present value of the collateral securing the foregoing obligations is (a) $89,315,255.01 (Monroe), (b) $12,656,966.30 (Goodwood I), and (c) $6,106,069.54 (Goodwood II). Holdings has additional HBAs with an aggregate net present value of approximately $12,861,536.97. Accordingly, the total net present value of HBAs exceeds $120,000,000.00 and there is potential equity for the benefit of unsecured creditors and equity holders.

39.     From and after November 29, 2022, the Defendants commenced the Primary State Actions. A summary of each of the Primary State Actions (the "Summary") is attached hereto as **Exhibit "B"**. Copies of the Complaints filed in the Primary State Actions are attached hereto as follows: (a) **Exhibit "C" – New Jersey;** (b) **Exhibit "D" – Pennsylvania;** (c) **Exhibit "E" - Ohio;** (d) **Exhibit "F" – Florida;** (e) **Exhibit "G" – North Carolina;** (f) **Exhibit "H" – Massachusetts; and** (g) **Exhibit "I" - Indiana**.

40.     In the Primary State Actions, the Defendants allege wrongdoing primarily related to unfair or deceptive trade practices and also including telemarketing violations. The Defendants further allege, among other things, that the filing of memoranda or similar notice, which provides constructive notice to the public of the existence of the HBA and its terms,

unfairly or deceptively interferes with the homeowner's ability to sell the home or access financing with respect to their homes.

41.     In several instances, the Defendants allege that the Plaintiffs made improper telephone solicitations to prospective customers without their consent. To date, the Plaintiffs have not been provided with any of the actual names of homeowners or telephone numbers that are allegedly the subject of these solicitations. As a result, the Plaintiffs have not had any meaningful opportunity to present in court the millions of lawfully obtained consents from prospective homeowners authorizing these very solicitations.

42.     It is alleged that the Plaintiffs' sales and marketing practices "prey" upon customers who are elderly or of diminished financial means. To date, none of the Defendants have produced any data, expert reports or analysis, or other evidence that would demonstrate such targeting actually exists or is reflected in the demographic composition of the portfolio of 34,000 HBAs. Moreover, an initial review of the composition of the HBA portfolio suggests such allegations are without merit. The typical homeowner in an HBA owns a home with an average value exceeding $300,000, and the average age of homeowners under HBAs is 55 years old (and 72% of homeowners are under age 65). By comparison, the American Housing Survey 2021, based on US Census Bureau data, indicates that only 67.3% of homeowners in the country are under the age of 65. Thus, the homeowners under the HBAs are proportionally younger than a typical cross-section of homeowners overall in the United States.

43.     It is also alleged and often strenuously implied in the Primary State Actions that a very significant portion of the Plaintiffs' customers are aggrieved. However, this allegation is inaccurate and unsupported. As noted in the attached Exhibit "B," the number of declarations or affidavits in support of the complaints filed by the States in the Primary State Actions, as well as

the number of HBAs in each of the respective states are as follows and actually reveal that the number of these customers is *de minimis* relative to the number of HBAs:

| State | States' Supporting Declarations/ Affidavits | Active HBAs[1] | Debtors' Supporting Declarations/Affidavits |
|---|---|---|---|
| New Jersey | None | 1,105 | 142 |
| Pennsylvania | None | 1,530 | 76 |
| Ohio | None | 869 | None |
| Indiana | None | 347 | None (filed in early September 2023) |
| Florida | 15 (3 of which from persons who are not parties to HBAs) | 7,678 | 454 |
| North Carolina | 16 | 2,079 | 250 |
| Massachusetts | 23 | 521 | 76 |

44.     As noted above, FL and NC have the largest number of HBAs among the Defendants. In contrast to the small number of sworn declarations or affidavits submitted by the Defendants, the Plaintiffs have obtained supporting sworn declarations or affidavits from HBA customers in FL, NC, NJ, MA, and PA.  The Debtors obtained at least 250 and more than 450 sworn statements or affidavits in NC and FL, respectively, from homeowners attesting that they understood the key terms and elements of the HBA.

45.     The Plaintiffs contend that the memoranda or other similar notice is separately signed and notarized by each homeowner under the HBA and is neither deceptive nor unfair.

---

[1] The Primary State Actions involve 14,129 out of a total of 33,959 HBAs nationwide. This equates to 41.61% of all HBAs. Conversely, nearly 60% of HBAs are not subject of the Primary State Actions.

Rather, the memoranda or other similar notices were filed in accordance with the applicable law of each state and are intended to provide public notice of the HBA. The memoranda assist the MV Realty Subs with a fair and reasonable way of enforcing its limited contractual rights in the event the homeowner attempts to sell their home without using the MV Realty Sub as their agent.

46.     It is also worth noting that the Debtors were previously represented by national and well-recognized local law firms prior to implementing the HBP in each state, who advised as to compliance with state and other applicable laws with respect to the sales and marketing of the HBP and HBAs, as well as with respect to the terms and conditions of the HBAs, the memoranda, and related agreements. In early 2022, the Debtors met with many state attorney generals and reviewed many aspects of the HBP including, without limitation, the term of the HBAs and specifically explained the recording of memoranda or other notices and the purpose and effect of doing so; no issues were raised by the various attorneys general with respect to the HBP or the memoranda or notice filings.

47.     Although many states have included a request for preliminary injunctive relief in the Primary State Actions, only MA and NC have actually obtained preliminary injunctions. With respect to the Primary State Actions, only MA, NC, and FL filed motions for preliminary injunctions and no hearing or discovery is expected to be scheduled in FL until after the Court decides this Motion.

48.     On September 18, 2023, the Superior Court in NC issued a "Preliminary Injunction Order" (the "NC Preliminary Injunction"), a true and correct copy of which is attached hereto as **Exhibit "J".**  The NC Preliminary Injunction directs, enjoins and prohibits the defendants (the "NC Defendants"), including MV NC and PBC FL, from, among other things:

(a) asserting or representing to any North Carolina homeowner or other persons that the NC Defendants hold any valid lien, security interest, or any other encumbrance on any home subject of an HBA, or that the NC Defendants have the right to recover any early termination fee or liquidated damages in connection with an HBA; (b) commencing or continuing to prosecute or maintain any legal action to enforce an early termination fee, lien, or other encumbrances, except that the NC Defendants are permitted to file a legal action or arbitration proceeding – consistent with the terms of the HBAs – in an effort recover damages for breach of the HBA (or negotiate a settlement of its claim)[2]; (c) within 30 days, the NC Defendants shall record terminations of *all* memoranda filed on properties of North Carolina homeowners associated with an HBA, which terminations shall remain in place during the pendency of the North Carolina Primary State Action; and (d) within 14 days, the NC Defendants shall file cancellations of any *lis pendens*. In the North Carolina court's "Order and Opinion on Plaintiff's Amended Motion for Preliminary Injunction" (the "NC PI Order"), the North Carolina court found that "the following findings of fact, which are made solely for the purpose of resolving the present PI Motion and are not binding in any subsequent proceedings in this action." *See* PI Order, p.2, §1. A true and correct copy of the NI PI Order is attached hereto as **Exhibit "K."**

---

[2] Although the NC Preliminary Injunction prohibits the NC Defendants from commencing or continuing to prosecute or maintain any legal action to enforce an early termination fee, lien, or other encumbrances, the NC Defendants are permitted to file a legal action or arbitration proceeding – consistent with the terms of the HBAs – in an effort recover damages for breach of the HBA (or negotiate a settlement of its claim). And although the NC Defendants are prohibited from asserting or representing to any North Carolina homeowner or other persons that the NC Defendants hold any valid lien, security interest, or any other encumbrance on any home subject of an HBA, or that the NC Defendants may recover any early termination fee or liquidated damages in connection with an HBA, the NC Defendants are permitted to file a legal action or arbitration proceeding – consistent with the terms of the HBAs – in an effort recover damages for breach of the HBA (or negotiate a settlement of its claim).

49.    On September 26, 2023, the North Carolina court issued an order, *sua sponte*, staying the deadlines set forth in the NC Preliminary Injunction Order (the "NC Stay Order").  A true and correct copy of the NC Stay Order is attached hereto as **Exhibit "L."** Although the deadlines in the NC Preliminary Injunction are currently stayed, the North Carolina court has ordered that the parties submit briefs by November 21, 2023, stating their respective positions on whether the stay should be lifted in light of this Court's prior order authorizing the NC Primary State Action to continue (ECF No. 171).

50.    The NC Preliminary Injunction has the absolute effect of dramatically reducing collections and rights of enforcement with respect to over 2,000 HBAs, which would result in a significant reduction in cash receipts by the Debtors without any final adjudication on the merits. In the event the NC Stay Order is lifted, the required removal of memoranda would cause irreparable harm or injury to the Debtors, since under North Carolina's newly enacted statute, effective August 24, 2023, the Debtors would likely be prohibited from re-recording memoranda in the event the Debtors ultimately prevail in the NC Primary State Action.

51.    On February 27, 2023, the Superior Court in MA issued a preliminary injunction (the "MA Preliminary Injunction"), a true and correct copy of which is attached hereto as **Exhibit "M".** The MA Preliminary Injunction, among other things, (a) prohibits PBC FL and MV MA from originating new HBAs, or recording mortgages in connection with an HBA, and (b) ordered the removal of any and all mortgages under the name "MV Realty of Massachusetts, LLC". All mortgages in MA have been removed from the public records and, therefore, notwithstanding there has been no final adjudication on the merits in the MA Primary State Action, the Debtors have lost the benefit of valuable property rights.

52.     The NC Preliminary Injunction and the MA Preliminary Injunction were issued with no bond and prior to a final adjudication on the merits of the NC and MA Primary State Actions.

53.     This Court recently issued orders authorizing NJ, NC, and MA to continue to prosecute their respective Primary State Actions subject, however, to the rights of the Plaintiffs to seek injunctive relief prior to the hearing scheduled before the Court on the Plaintiffs' request for injunction relief commencing February 12, 2024, including on this Motion (the "February 2024 Hearing"). *See* ECF Nos. 170, 171, and 172. Moreover, the Court has issued a scheduling order in connection with the February 2024 Hearing, which includes deadlines relating to discovery.

54.     In order to achieve efficiencies and other cost savings, the Debtors have reached out to certain states, including, without limitation, MA, FL, NJ, IN, and PA, in an effort to present stipulations relating to discovery in the Adversary Proceeding and the Primary State Actions. While several states have expressed they would consider discovery protocols, some states appear opposed to any efforts to streamline discovery.

55.     The Plaintiffs submit that reasonable discovery protocols include the following (the "Discovery Protocols")[3]: (a) discovery in the Adversary Proceeding should be prioritized over any discovery in the Primary State Actions; (b) any discovery conducted in the Adversary Proceeding should not be duplicated in the Primary State Actions; (c) any discovery conducted in the Adversary Proceeding shall be admissible in the Primary State Actions; and (d) any deponent

---

[3] The Plaintiffs reserve the right to file a request for a temporary restraining order (supported by declarations) prior to the February 2024 Hearing in the event the States do not agree to the Discovery Protocols..

who is deposed in the Adversary Proceeding shall not be required to appear for deposition in any of the Primary State Actions.

56.     The Discovery Protocols would streamline discovery, reduce costs for both the Plaintiffs and the Defendants, and will avoid duplicative discovery efforts. Furthermore, the Discovery Protocols would avoid deponents from having to appear for multiple depositions. In light of the number of pending Primary State Actions, it is possible that deponents could be forced to appear multiple times for depositions.

57.     In addition to the Primary State Actions, other actions have been commenced by real estate regulatory commissions that include both the MV Brokerage Subs and individually licensed real estate agents and brokers in connection with their work on the HBAs. These actions also potentially threaten the livelihood of the affected agents and/or brokers and could potentially result in prejudice to the Plaintiffs and other Debtors as a result of the preclusive effects of any adverse decisions and may also trigger material indemnification obligations owed by one or more of the Debtors, including the Plaintiffs.

58.     Finally, several states, including, but not limited to, Florida and North Carolina, have enacted statutes limiting agreements similar to the HBAs. In Florida, section 475.279, Florida Statutes, was recently enacted, effective July 1, 2023. In a recent limited objection filed by Florida in the main case (23-17590), Florida quoted section 475.279(2), Florida Statues, in stating that "[a] court may not enforce a residential loan alternative agreement by a lien or construction trust in the residential real property or upon the proceeds of the disposition of the real property." *See* ECF No. 169, ¶2.  Section 475.279 was effective July 1, 2023, yet Florida argues in reliance upon the newly enacted statute to prevent enforcement of any liens arising in connection with the HBAs or memoranda or the enforcement of early termination fees. *See id.* at

¶3.   Thus, Florida seeks retroactive application of the newly enacted statute, since the active HBAs in Florida were entered prior to July 1, 2023.

59.     In addition to Florida and North Carolina, the states of Colorado, Maryland, and Tennessee also enacted statutes now limiting agreements such as the HBAs.

## THE CHAPTER 11 PROCEEDINGS

60.     The Debtors commenced the Chapter 11 proceedings to protect and maximize the value of their assets and for the purpose of implementing one or more strategies aimed at resolving or alleviating or otherwise minimizing the financial strain of the Primary State Actions. The Debtors also intend to preserve estate assets for the benefit of all creditors.

61.     Although the Primary State Actions *may* include exercises of the Defendants' police or regulatory power, which may not otherwise be subject to the automatic stay in effect pursuant to 11 U.S.C. § 362(a) (the "Automatic Stay")[4], one or more of the actions taken, or remedies requested by the Defendants clearly impact or consist of actions taken to obtain or exercise control over Property of the Estate, including, without limitation, the HBAs, memoranda and other recorded notices, including proceeds of the foregoing, as well as disgorgement.

## COUNT I

**(Injunctive Relief - Section 105)**

62.     The Plaintiffs each reallege and incorporate the allegations contained in Paragraphs 1 through 61 of this Complaint as though set forth fully herein.

63.     The Plaintiffs have a substantial likelihood of succeeding on the merits, as the Plaintiffs have a reasonable likelihood of a successful resolution to the Chapter 11 case. A successful reorganization is more likely with an injunction in place. Approximately forty percent

---

[4] The Plaintiffs reserve and do not waive any right to argue that actions taken by one or more of the Defendants may not be an exercise of police and/or regulatory power.

(40%) of the HBAs are involved in the Primary State Actions[5]. Assuming, *arguendo*, that the HBAs in the Primary State Actions were eliminated, a notion that the Plaintiffs vehemently oppose, the Debtors still would have nearly sixty percent (60%) of the HBAs in an active state. A plan of reorganization could be confirmed based on these remaining HBAs, since a plan could be confirmed with the consent of Monroe and Goodwood, albeit with far less distributions for general unsecured creditors.

64.    Moreover, any claims by the Defendants for fines, penalties, or other money damages, must be presented to this Court *via* the filing of proofs of claim for distribution. This Court has already noted that the Defendants may not enforce any monetary awards outside these Chapter 11 proceedings. Finally, a plan of reorganization could provide for a claims adjudication process for consumers.

65.    The Plaintiffs (and Debtors) will suffer immediate and irreparable harm or injury if the Defendants are permitted to continue with the Primary State Actions, or to exercise control over or enforce any potential claims against Property of the Estate. These acts would impair the ability of the Plaintiffs to reorganize and result in irreparable harm or injury to, and cause immediate adverse economic consequences for, the Plaintiffs, their estates, and Estate Property.

66.    Furthermore, nearly every one of the Defendants is seeking to exercise control over Property of the Estate in direct and absolute conflict with the policies of the Bankruptcy Code. The Defendants are either seeking rescission of the HBAs, cancellation of memoranda, or are seeking to enjoin enforcement of the Plaintiffs' rights under the HBAs. These acts would impair the ability of the Plaintiffs to reorganize and result in irreparable harm or injury to, and

---

[5] Even with respect to the 40% of HBC involved in the Primary State Actions, less than 1% of the HBA customers, by affidavit or sworn declaration, have indicated they were subject to an unfair or deceptive trade practice or were otherwise aggrieved.

cause immediate adverse economic consequences for, the Plaintiffs, their estates, and Estate Property. As the Court has jurisdiction over Property of the estate, the Primary State Actions "threaten the integrity of the bankruptcy process" if not stayed.

67.     Several states, including New Jersey, North Carolina, Pennsylvania, Massachusetts, and Indiana seek rescission or to void the HBAs. Moreover, states including Pennsylvania, Florida, North Carolina, Massachusetts, and Indiana seek restitution or payment of damages to consumers. Not only do the Defendants seek to exercise control over Property of the Estate, but these states are representing and are advancing a "private interest." However, the private interests of the HBA parties may be pursued by filing proofs of claim in these Chapter 11 proceedings. Accordingly, these states should be prohibited from seeking rescission or restitution.

68.     The harm to the Plaintiffs and Debtors is significant in the absence of an injunction, while the harm to the Defendants is minimal. Here, the Plaintiffs have had very little, if any, opportunity to present evidence in opposition to the Primary State Actions. The Plaintiffs are no longer entering into HBAs and, at this point, the Debtors are servicing the existing HBAs. Absent injunctive relief, the Plaintiffs stand to lose Property of the Estate, which would have a severe detriment on the Debtors' reorganization efforts, notwithstanding the millions of dollars in attorneys' fees and costs.

69.     If no inunction is issued, and the Plaintiffs ultimately prevail, or a compromise is entered down the road, the Plaintiffs will have already suffered irreparable harm and significant, adverse economic consequences.  On the other hand, if an injunction is issued, there is little harm to the Defendants. Notwithstanding the passage of time, only two of the Defendants have obtained preliminary injunctions, and one of the Defendants waited nearly a year after filing its

complaint to present a request for a preliminary injunction. Moreover, any monetary relief which may be afforded the Defendants must be presented to this Court, and any consumers who are parties to HBAs have been noticed and afforded an opportunity to present claims to this Court. Finally, the Discovery Protocols benefit the Plaintiffs and the Defendants.

70.     Finally, the public interest will be served by issuing injunctive relief.

71.     In the Debtors' case, a reorganization will benefit creditors and is in the public interest.  From a public interest perspective, a stay does not necessarily mean that the Defendants will not have their day in court.  But, in the absence of a settlement of the Primary State Actions, it is certainly possible that a more cost-efficient and streamlined process for adjudicating such claims can be achieved at considerable cost savings for the estate and creditors.

72.     Finally, if the Primary State Actions are not enjoined with respect to non-debtor Defendants, there is a risk of indemnification and collateral estoppel and evidentiary prejudice. Moreover, the Debtors' chief executive officer and other key employees have been and will continue to be distracted from the Debtors' reorganization efforts.  The foregoing would result in immediate and irreparable harm to the Debtors, including the Plaintiffs, and could result in the loss of Property of the Estate.  For the reasons stated herein, the balancing of harms and equities weigh in favor the Plaintiffs, and the public interest is served in the event the Plaintiffs (and Debtors) successfully reorganize for the benefit of all creditors of the estate.

## **RESERVATION OF RIGHTS**

73.     The Plaintiffs reserve any and all of their rights, claims, defenses, and objections, including, without limitation, the right to seek emergency relief, as well as to seek a temporary restraining order at any time. Nothing contained herein is intended or should be construed as a waiver of any such rights, claims, defenses, and objections.

74.     The filing of the adversary complaint is also without prejudice or waiver of the Debtors (and Plaintiffs') rights to seek additional relief, including, without limitation, by separate adversary complaint and request for injunctive relief, in any other actions pending, other than the Primary State Actions, or any action that may be commenced hereafter.

**WHEREFORE**, the Plaintiffs respectfully request that the Court find in their favor on all counts of the Complaint as follows:

(A)     Issue a preliminary injunction prohibiting and enjoining the Office of the Attorney General, State of Florida Department of Legal Affairs ("FL"), Commonwealth of Massachusetts ("MA"), Commonwealth of Pennsylvania (By Attorney General Joshua Shapiro) ("PA"), Matthew V. Platkin, Attorney General of State of New Jersey ("Platkin"), Cari Fais, Acting Director of the New Jersey Division of Consumer Affairs ("Fais"), State of North Carolina, Joshua H. Stein, Attorney General ("NC"), and Ohio Department of Commerce, a Division of Real Estate and Professional Licensing ("OH"), and Office of the Attorney General, State of Indiana ("IN" and collectively with Florida, Mass, PA, Platkin, Fais, NC and OH, the "Defendants") from taking any actions against property of the estate, within the meaning of 11 U.S.C. § 541(a) ("Property of the Estate"), including, without limitation, actions that result in the cancellation, rescission, or modification of any Homeowner Benefit Agreements ("HBAs"), memoranda, mortgages, or any proceeds of the foregoing, pending a final adjudication on the merits (in other words, a final, non-appealable order) on the Primary State Actions entered by this Court or any local court of competent jurisdiction presiding over the Primary State Actions; *provided, however*, the foregoing is without prejudice to, or waiver of, the Plaintiffs' rights to seek a temporary restraining order, including on an emergency basis, pending any hearing on this Motion, in the event that any of the Defendants seeks to take action against Property of the Estate pending the Court's final determination of the Plaintiffs' request for a preliminary injunction;

(B)      Issue a preliminary injunction prohibiting and otherwise enjoining the Defendants from seeking to enforce or collect upon any monetary award issued in the Primary State Actions, even if liquidated by this Court, including, without limitation, any fine, penalty, disgorgement, restitution, or award of attorneys' fees, costs, or investigative costs, outside this Court and directing that the Defendants must file a proof of claim in the above-styled Chapter 11 proceeding in order to be entitled to receive any distribution on account of any such proof of claim; *provided, however*, the foregoing is without prejudice to, or waiver of, the Plaintiffs' rights to seek a temporary restraining order, including on an emergency basis, in the event that any of the Defendants seek to enforce or collect upon any monetary award issued in the Primary State Actions, even if liquidated by this Court, including, without limitation, any fine, penalty, disgorgement, restitution, or award of attorneys' fees, costs, or investigative costs, outside this Court;

(C)      issue a preliminary injunction prohibiting and otherwise enjoining the Defendants from (i) requesting, obtaining, or enforcing rescission of any HBAs, cancellation of any memoranda, mortgage, other recorded notice, or (ii) requesting, obtaining, or enforcing any monetary amount payable to any homeowner or party to a HBA, including, without limitation, by disgorgement, restitution, or money damages; *provided, however*, the Plaintiffs reserve the right to seek a temporary restraining order in the event any of the Defendants seek to immediately take any of the foregoing actions prior to a hearing on this Motion; and

(D)      issue a preliminary injunction ordering compliance with the Discovery Protocols (defined herein), as well as with respect to any individual or affiliated defendants in the Primary State Actions, but only in the event the Defendants do not agree with the Discovery Protocols; *provided,*

*however,* the Plaintiffs reserve the right to seek a temporary restraining order in the event any of the Defendants do not agree with the Discovery Protocols in the immediate future.[6]

The Plaintiffs further request that the Court grant such other and further relief that the Court may deem just and proper.

/s/Michael D. Seese
Michael D. Seese, Esq.
Florida Bar No. 997323
Seese, P.A.
101 NE 3rd Avenue
Suite 1500
Ft. Lauderdale, Florida 33301
Telephone:  954-745-5897
mseese@seeselaw.com

*Counsel for the Plaintiffs*

---

[6] The Plaintiffs are not presently seeking a temporary restraining order since the Discovery Protocols were only recently presented. However, in the event the Defendants do not agree with the Discovery Protocols, the Plaintiffs reserve the right to seek a temporary restraining order and to file supporting declaration(s).